## HILA W. SMITH v. HORACE SPEED.

(Filed July 6, 1901.)

1. **COURTS—Authority for.** The judicial authority of the territory was originally derived from the organic act which provided that the judicial power of the territory "shall be vested in a supreme court, district courts, probate courts and justices of the peace * * And said supreme and district courts, respectively, shall posses chancery as well as common law jurisdiction, and authority for redress of all wrongs committed against the constitution or laws of the United States or of the territory, affecting persons or property."

2. **JURISDICTION—Due Process of Law.** The equitable and common law jurisdiction thus granted were a part of that " due process of law" which is guaranteed to every citizen of this country as a protection of his life, liberty and property, and the jurisdiction of these courts and judges in equity as provided in the organic act, is as much due process of law as is the right of trial by jury in cases at the common law.

3. **CONTEMPT—Authority for Punishment for.** The power which existed in these courts of compelling obedience to the law and to the process and authority of the court in a case in which the courts have jurisdiction, and to fine and imprison for a contempt thereto is inherent in the courts, necessary for their preservation, and as much the law of the land and due process of law as any other part of the common law or chancery jurisdiction which have come down to us under the guarantee of the constitution of the United States referred to, and by the organic act, given to the su-

preme and district courts of this territory. It exists in the courts. themselves for the protection of the rights of parties coming before them in the exercise of the jurisdiction of the court, for the preservation of the rights therein duly submitted to them, and in order that the usefulness of the court or of the judge exercising the jurisdiction should not fail but should be effective, as well also as to vindicate the court from disrespect.

4. ORDERS OF COURT—Enforcement—Punishment for Violation. The enforcement of the judgments and orders of the court in proper cases, carries with it the equal power to punish for a disobedience of such orders, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court whose order has been so disobeyed.

5. CONTEMPT—Power of Legislature. The legislature of this territory has no power to take away from the courts whose jurisdiction originated in the organic act, the right to punish a contempt, and to either turn it over to a separate tribunal, and remove the hearing of it to another county, nor to cause the matter to be submitted to a trial by jury.

6. JUDGE IN CHAMBERS—Powers of. The judges, when sitting in chambers, have the same power and jurisdiction with respect to the business to be brought before them, as if they were, respectively, sitting in open court.
(Syllabus by the Court.)

*Error from the District Court of Logan County; before Bayard T. Hainer, Trial Judge.*

J. W. *Shartel* and *Cotteral & Hornor,* for plaintiff in error.

*Horace Speed,* for defendant in error.

STATEMENT OF FACTS.

The petition filed in this case on the 30th day of January, 1900, in the district court of Logan county, stated that the plaintiff, the defendant in error here, was the owner and in possession of lots 19 and 20, in block 37, in the city of Guthrie, in that county, and that the defendant was the owner and in possession of lot 21, in the same block, lying on the south side of and adjoining lot 20; that lot 21 is vacant except that it has

some trees and vines and flowers upon it, and is at times used as a vegetable garden; that the lots of the plaintiff are occupied by his residence, but that on the 26th day of January, 1900, the defendant, with laborers, began to build on the south line of plaintiff's lot No. 20 a high and tight board fence, and would, unless restrained by the court, build a board fence of from eight to fourteen feet in height, along the whole of the south line of lot 20.

The plaintiff averred that no benefit could accrue to the defendant by the erection of such a fence; that it would cut off from the plaintiff's house and yard, the natural circulation of air and access of light, and would injure and kill his grass vines and flowers, and that by obstructing the light and air, the heat within the plaintiff's yard and house would be increased, making them less habitable and comfortable, and thus sickness would be increased and recovery endangered in this climate, and irreparable injury caused to the plaintiff, and that the act was inspired by malicious motives, and with intent to injure the plaintiff.

The matter having been presented to Chief Justice Burford, the presiding judge at his chambers in the city of Guthrie, a restraining order was granted on the 30th day of January to the effect that: "The defendant and her employes should abstain from any further construction of said board fence between or on the line of said lots 20 and 21 until further order of the court."

On the 9th day of February thereafter, the defendant filed her motion to dissolve the injunction, and on the 16th day of February, the said motion was heard in open court, and overruled.

Thereafter and on the 10th day of July, a motion was filed in the cause by the plaintiff, setting up the terms of the temporary injunction, and alleging that afterwards, and on the morning of July 4, 1900, the defendant in violation of the letter, spirit and intent of the order, began, before five o'clock a. m., with a force of ten or twelve workmen and during that day constructed upon the line between said lots 20 and 21 a tight, high board fence of the height of fourteen feet and of the length of sixty feet; that said fence has a board lean-to roof and rough board sides, apparently making a shed structure, without foundation or floor, and that the necessary effect, **and the effect intended** by the defendant, was to injure the property of the plaintiff and his use and enjoyment thereof.

The plaintiff moved for an order of attachment and citation against the defendant, for the imposition of a fine, and that she be required to immediately remove the said fence and leave it as it was at the time the temporary injunction issued in the case, and that in default thereof, she should be committed to custody until she fully complied with the requirements, or be otherwise legally discharged.

Thereafter, and on the 10th day of July, 1900, the presiding judge at his chambers in the city of Guthrie, upon a hearing upon the said application, ordered that the citation issue, and be made returnable, "before the judge of the district court of Logan county, at his chambers in the city of Guthrie, on the 14th day of July, 1900, and then and there show cause why she should not be punished for a contempt of court, and to do whatsoever may be commanded of her."

Thereafter, and on the 14th day of July, the defendant in person appeared and moved the court to quash the citation

for this defendant, "because the said judge has no authority or jurisdiction to hear or determine said matter or to adjudge the defendant in contempt of court," and on the same day filed an affidavit in the cause, demanding a change of judge, alleging that the presiding judge of the district was prejudiced against her, and that she could not have a fair trial before him.

Upon the same day she filed her answer to the motion, averring that she had at no time done or permitted any act to be done, in violation of the orders of the court, granting said injunction, and denying the allegations of the petition, and averred that she did build a structure on the line between lots 20 and 21; it was not intended as a fence, but was "a building to subserve a useful purpose in the use and enjoyment of her own property. And that it was not built in violation of the orders of the court made in the injunction order."

Thereupon, Associate Justice Hainer, of the Fourth judicial district, was assigned to hear all matters or causes pending in the court of the First judicial district, in the absence of the presiding judge, and this case was heard upon the application of the plaintiff and the citation for alleged contempt, and the defendant having, on the 14th day of July, 1900, filed a written objection to the jurisdiction of the judge at chambers to hear and determine the matter, and the motion then being argued, the judge overruled said motion and objection to his jurisdiction as a judge in chambers, to hear and determine said matter. Thereupon the defendant having demanded the right of trial by jury, this application was also overruled, and the matter having then been presented upon the evidence and arguments of council, the court further found that the defendant had been guilty of a violation of the temporary injunction

in force in the case, whereupon she was ordered to pay a fine of one dollar, together with the costs, and to remove the structure upon the party line between the lots in question within three days; and in default thereof, to be committed to close custody until the removal is made.

The order appealed from was not the injunction, but was from the order of the judge by which the appellant was found to be in contempt for disobedience of the injunctional order of the court, by which she was fined one dollar and costs and "committed to close custody until the removal is made."

Opinion of the court by

McATEE, J.: The question raised is whether, under the general jurisdiction of the district courts, and the judges of the district courts of this territory, as given by the organic act, and under the various acts of the legislature, passed since that time, the judge had the authority, while sitting in chambers in the exercise of the chancery jurisdiction, to enforce obedience to the orders so passed by him; and to punish the violation thereof.

By the organic act, "to organize the Territory of Oklahoma," it was by section 9 provided:

"That the judicial power of said territory shall be vested in a supreme court, district courts, probate courts and justices of the peace, * * * * and said supreme and district courts respectively, shall possess chancery, as well as common law jurisdiction, and authority for redress of all wrongs committed against the constitution or laws of the United States or of the territory affecting persons or property."

And by section 4, that:

"The legislative power and authority of said territory shall be vested in the governor and legislative assembly."

And by section 6:

"That the legislative power of the territory shall extend to all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States, * * *"

Thereafter, by the legislative authority of the territory so authorized, it was provided, Code of Civil Procedure, Statutes of 1893, section 4129, that:

"(4129) 251.—The injunction may be granted at the time of commencing the action, or at any time afterwards, before judgment by the district court, or the judge thereof, or, in his absence from the county, by the probate judge, upon its appearing satisfactorily to the court or judge, by the affidavit of the plaintiff or his agent, that the plaintiff is entitled thereto."

And by the legislature of 1895, it was enacted, Statutes of 1895, p. 91, section 1:

"Contempts of court shall be divided into direct and indirect contempts. Direct contempts shall consist of disorderly or insolent behavior committed during the session of the court, and in its immediate view and presence and of the unlawful and wilful refusal of any person to be sworn as a witness and the refusal to answer any legal or proper question; and any breach of the peace, noise or disturbance, so near to it as to interrupt its proceedings, shall be deemed direct contempt of court, and may be summarily punished as hereinafter provided for. Indirect contempts of court shall consist of wilful disobedience of any process or order lawfully issued or made by court, resistance wilfully offered by any person to the execution of a lawful order or process of court."

Section 2:

"Punishment for contempt shall be by fine or imprisonment, or both, at the discretion of the court; but the fine in no case shall exceed fifty dollars, or the imprisonment a longer term than ten days in the county jail. Provided, That when any person shall be imprisoned for the non-payment of a fine, he shall be discharged at the expiration of thirty days. Indirect contempts shall be shown to the court by an information stating the acts constituting the contempt, and the facts may be shown either by affidavit or testimony of witnesses, as the court may direct."

Section 3:

"In all cases of indirect contempt the party charged with contempt shall be notified in writing of the accusation and have a reasonable time for defense; and the party so charged shall, upon demand, have a change of judge or venue, and a trial by jury."

It is now contended that the authority of the district court or the judge thereof to grant an injunction before judgment, and to punish for the disobedience thereof as a contempt by the court or judge, is derived from the act of the legislature of 1893, and that the power of the courts and judges to enforce their orders and punish for a disobedience of the orders of court granted in proceedings in court, or of orders made in proper cases by the judge in chambers, are modified, lessened or destroyed by the provisions of the Stautes of 1895, which provide that direct contempt of a court are those only which are committed during the session of the court, and in its immediate view, and presence and the unlawful and wilful refusal of any person to be sworn as a witness, to answer proper questions, and breaches of the peace in the presence of

the court, and that indirect contempts of court shall consist of wilful disobedience of any process or order lawfully issued or made by court; resistance wilfully offered by any person to the execution of a lawful order or process of a court, and that punishment for contempt shall be by fine or imprisonment at the discretion of the court, but that the fine shall in no case exceed fifty dollars, and that the imprisonment shall not last longer than ten days in the county jail, and that the party so charged with contempt of court shall, upon demand, have a change of judge or venue, and a trial by jury.

The contention, if correct and effective, would destroy the power of the courts to enforce their orders, except so far as an enforcement or punishment of the order would exist, which should not exceed a fine of fifty dollars or an imprisonment in the county jail of not longer than ten days. It would, if the contempt of court were an "indirect" contempt, entitle the party resisting the order of the court, to have a change of judge or of venue, or of both, and it would also give to him a trial by jury. And if the contention is effective and can be sustained, it would destroy and obliterate the power of the judges of the court while sitting in chambers, to enforce compliance with the orders thus made, or to punish for contempt at all, whether direct or indirect.

It is difficult to foresee the entire consequences if this were the law. It is a common case in the various districts of the territory, in divorce proceedings brought by the wife, that the judge in chambers shall grant, upon a proper showing, an order restraining the defendant husband from conveying away his real estate or of disposing of his personal property, until the pending case shall be heard upon the merits. Such orders

are conceded to be within the chancery jurisdiction of a judge at chambers. The exertion of this authority frequently constitutes the only relief for an abandoned or abused wife, and the enforcement of such orders by fine and imprisonment, or the apprehension of such enforcement, frequently constitutes the only assurance of ultimate protection. Such orders frequently cover and include property amounting to many hundreds or thousands of dollars.

If it now should be found that the judge has no power to enforce his order at all or to punish for contempt, and that the court has no power to punish beyond a fine of fifty dollars and imprisonment not exceeding a longer period than ten days in the county jail, and that a change of judge may be had and a change of venue from the county, and that a trial by jury may be had, to determine whether the recalcitrant party is in contempt at all or not, it will be admitted by the bar, acquainted with the law's delays, that the power to punish for contempt, either direct or indirect, being destroyed in 'the judge, will be to a great extent destroyed also in the court, and rendered valueless.

If the contention now sought for by the plaintiff in error could be sustained, it would go to the extent that the court, in equitable proceedings, after a full hearing and a final determination and judgment upon the merits, is without the power to enforce its judgments by the imposition of a pecuniary penalty or imprisonment, and that, in the endeavor to enforce its judgment by proceedings in contempt, it would be subject to have its final judgment brought into review in the contempt proceedings upon a change of judge, or of venue, to a completely new jurisdiction and to a trial by jury, in

which the merits of the final order, which has been made by the court, in the proceeding, should again be reviewed, including the question whether there was any merit, right or authority of the court in the equitable proceedings in which the judgment had been rendered, or the order made, and the equitable jurisdiction of the district court upon matters finally determined would thus be subject to be again brought in question by another judge in another venue and by a jury, a thing unheard of in the chancery jurisdiction. If such a state of things could be, it could but result in the degradation of courts, and to make them truly the subjects of contempt.

If, in the progress of steps tending to demolish the equitable jurisdiction of the district courts and judges, the point should now in this case be reached, and it now be held that neither the courts nor the judges have authority or jurisdiction to enforce the orders which it is their duty to make, but that the proceedings in contempt requisite to enforce such orders are to be subjected to trial by jury, removed to another county, and tried before another judge, there is no reason why an act of the legislature may not also be passed and held to be just as effective, which would undertake to submit the contempt proceedings to the jurisdiction of a justice of the peace, either in the county where the violation of the court's orders occurred, or in some other county; and in that event, the immense and beneficent jurisdiction in chancery, the result of the labors of Nottingham, Hardwick, Thurlow and Eldon, and others of the English chancellors who have so largely enunciated this jurisdiction, and of the equally eminent judges of our own supreme court, from Chief Justice Marshall to our own day, who have joined in its confirmation, would be subject to the supremacy of justices of the peace, with their juries.     No

reputable lawyer would consent to occupy the bench in such a condition of things, and this court would, if it could abide such a contention and prospect, be instrumental in destroying the chancery jurisdiction which they were appointed to uphold.

But such is not the law. The equitable jurisdiction of the courts and judges is not perhaps as generally apprehended at large, but is well understood by the enlightened knowledge of the bar, and is capable of as succinct and definite ascertainment as is the right of trial by jury at the common law.

The development of the common law was first in order of time, but as society developed, and its business and interests became complicated, the necessity arose for jurisdiction in injunction, in mandamus, in actions to quiet title to real property, and in other branches of the equitable jurisdiction in which a jury and proceedings at common law were not effective to obtain the relief sought for, and the equitable jurisdiction arose. It has now existed for centuries in England and America, and the equitable jurisdiction of the courts and the judges of the country is as much that "due process of law" which is guaranteed to every citizen of this country as a protection of his life, liberty and property, as is the right of a trial by jury in cases at common law, and the equitable jurisdiction and the right of the people to have their equitable rights determined by the courts and judges in equity, according to the established methods of the chancery jurisdiction, as is the right of trial by jury. And this jurisdiction, known and guaranteed by the constitution of the United States, as "due process of law," was, by the organic act, reposed in the supreme court and distrist courts, respectively," which it was

there said "shall possess chancery, as well as common law jurisdiction, and authority for the redress of all wrongs committed against the constitution or laws of the United States, or of the territory affecting persons or property." (*Brown v. Buck,* 75 Mich. 274, 13 Am. St. Reps. p. 445.)

Interests as great and important, if not greater and more important, involving the rights of persons and property, and their adequate protection, now depend upon the equitable jurisdiction of the courts and judges, than at common law, and it is due to the citizenship of the country, that the courts should preserve this jurisdiction in its integrity from improvident legislation, recklessly tending to dissipate and destroy it. In its exercise, as now known and understood for ages past, it is as sacred a privilege and liberty, and stands upon the same firm footing, as the various muniments and privileges and rights of the common law, including that of trial by jury. And it would tend to the destruction of these privileges and rights if the contention of the plaintiff in error should now be sustained, and an injunctional order of the court granted upon authority conceded to exist, conceded not only by the grant of general chancery jurisdiction by the organic act, but also enunciated in the sections of the Statutes of 1893 itself, hereinbefore recited, if the judge of the court, having the parties before him, and having the jurisdiction to grant the order made in this case, could not now enforce it otherwise than by conceding to the disaffected party a trial by jury, before another judge and perhaps in another county, upon the question as to whether he had jurisdiction to grant the order, whether he did correctly grant it, and whether it ought now to be enforced, which would of necessity constitute the main point of inquiry in any proceeding to determine whether a contempt has been committed or not.

The exercise of his authority, so necessary to carry into effect the decrees and vindicate the authority of the court, has existed for a period whereof the memory of man runneth not to the contrary; is, no doubt, contemporaneous with the origin of common law, and the chancery jurisdiction themselves, became a part of the English common law for a period so long prior to the Fourth of July, 1776, that its origin can neither now nor could at that time, have been determined, and was engrafted in its entirety upon our system of jurisprudence prior to and at the time of our separation from the mother country.

It was said by Chief Justice Wilmot, as cited in *Carter v. Commonwealth,* 96 Va. 791, that:

"The power which the courts in Westminster Hall have of vindicating their own authority is coeval with their first foundation and institution; it is a necessary incident to every court of justice, whether of record or not, to fine and imprison for a contempt acted in the face of the court; and the issuing of attachments by the supreme court of justice in Westminster Hall for contempts out of court stands on the same immemmorial usage which supports the whole fabric of the common law. It is as much the *lex terrae* and within the exception of *Magna Charta,* as the issuing of any other legal process whatsoever. I have examined very carefully to see if I could find out any vestiges of its introduction, but can find none. It is as ancient as any part of the common law. There is no priority or posteriority to be found about it. It cannot, therefore, be said to evade the common law. It acts in alliance and friendly conjunction with every other provision which the wisdom of our ancestors has established for the general good of society. Truth compels me to say that the mode of proceeding by attachment stands upon the very same foundation as trial by jury. It is a constitutional remedy in particular cases and

the judges in those cases are as much bound to give an activity to this part of the law as to any other." (3 Campbell, Lives of Chief Justices, p. 153.)

Since, therefore, these courts have derived their jurisdiction from the provisions of the organic act, they must necessarily be possessed and are possessed of such powers as existed in the courts and judges exercising chancery jurisdiction at the time of the enactment of the constitution of the United States, which were necessary for the enforcement of their orders, for the  protection of the rights which they were required to pass upon, and for the complete and efficient exercise of that jurisdiction.  These powers are inherent, not depending upon any express description, but existing in the courts themselves for the protection of the rights  of  parties  coming before them in the exercise of the jurisdiction of the court, for the preservation of the rights therein duly submitted to them, and for the enforcement of their orders, in order that the usefulness of the court or of the judge  exercising the chancery jurisdiction should not fail, but should be effective as well as also to vindicate the court from disrespect shown to it or its orders, or, as it was said in *Respublica v. Oswald,* 1st Dall. 329, by Chief Justice McKean:

"Not only my brethren and myself but, likewise, all the judges of England, think that without this power no court could possibly exist—nay, that no contempt could, indeed, be committed against us, we should be so truly contemptible. The law upon this subject is of immemorial antiquity, and there is not any period when it can be said to have ceased or discontinued."

It was said *In re Debs,* 158 U. S. 594, Brewer, J., that:

"The power of a court to make an order carries with it their equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court. This is no technical rule. In order that the court may compel obedience to its orders it must have the right to inquire whether there has been any disobedience thereof. To submit the question of disobedience to another tribunal, be it jury or another court, would operate to deprive the proceeding of half its efficiency."

And in passing upon that case, which was agreed to by the whole court, the court adopted the declaration made in *Watson v. Williams,* 36 Miss. 331, 341, in which it was declared that:

"The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge. It is a power inherent in all courts of record, and co-existing with them by the wise provisions of the common law. A court without the power effectually to protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against the recusant parties before it, would be a disgrace to the legislation, and a stigma upon the age which invented it."

And in the same case the supreme court of the United States likewise unanimously adopted the declaration made in *Cartwright's Case,* 114 Mass. 230, 238, that:

"The summary power to commit and punish for contempts tending to obstruct or degrade the administration of justice is inherent in courts of chancery and other superior courts, as essential to the the execution of their powers and to the maintenance of their authority, and is a part of the law

of the land, within the meaning of *Magna Charta*, and of the twelfth article of our Declaration of Rights."

It cannot be conceded that the right to punish a contempt may be turned over by the legislature to a separate tribunal.

It was said by the supreme court of the United States, in *Elenbecker v. Plymouth Co.*, 124 U. S. 36, that:

"If it has ever been understood that proceedings according to the common law for contempt of court have been subject to the right of trial by jury, we have been unable to find any instance of it."

And in *Interstate Commerce Commission v. Brimson*, 154 U. S. 447, 448, it was again said that:

"Surely it cannot be supposed that the question of contempt of authority of a court of the United States, committed by a disobedience of its orders, is triable, of right, by a jury."

It was said by Blackstone, as quoted in 154 U. S. 595, that the sole adjudication in contempts belongs to each respective court.

The legislature itself and the powers with which it is vested, have been created by the same organic act as that which created, organized and prescribed the jurisdiction of these courts. The courts and the legislature are of co-equal origin. Neither may interfere with the proper sphere of the other. The legislature and its acts, within their proper sphere, are entitled to the support of the courts. The courts when exercising their authority as prescribed by the organic act, and in the exercise of that inherent power, which is necessary to their pres-

ervation, to the enforcement of the rights which they are compelled to pass upon, and of the preservation of their dignity and the respect which they are entitled to, have also a right to the consideration of the legislature, and these mutual relations of respect and mutual efforts of preservation will no doubt, always exist when their proper relations and the necessity for their individual existence and authority of each, are properly understood.

The same reasoning which is applicable to the courts is applicable likewise to the judges of those courts, while sitting in chambers.

It is said in 2nd Daniels Chancery, 6th edition, 1323, that:

"The judges, when sitting in chambers, have the same power and jurisdiction in respect to the business to be brought before them, as if they were respectively sitting in open court."

It was the uniform practice in chancery, that the judges in chambers were possessed of the authority to make orders similar to the injunctional order which was passed in the present case, and the same power which exists in the courts for the enforcement of the orders which are made by them, exists also in the judge when sitting at chambers with relation to the enforcement of rights which are properly the subject of the orders made by him, while sitting in that manner.

The statute, sections 4129 and 4137, by which the legislature undertook to "grant" to the district court or judge, the power to grant injunctional orders by the judge in chambers, and to enforce them by act of the court, was the enunciation and declaration by the legislature of the authority and juris-

diction of these courts and judges, as they existed after their creation by the act of congress known as the organic act. And while the authority to grant such orders in chambers is inherent in the courts and judges under the act of congress, the enunciation thereof also still standing upon the statute books of the territory, the power to enforce obedience to the orders so made, exists to the same extent with the authority itself.

It was said in *Carter v. Commonwealth,* 96 Va. 791, 45 L. R. A. 314, that:

"Whoever, therefore, belongs to either one of these great departments is an agent and servant of a common master; and each and all represents a part of the sovereignty of the state, so long as they move within the appropriate spheres prescribed to them by the organic law. A court and the judge thereof, is as much an agent and servant of the people as any other officer of government, and he is bound by the duty and obligation which he owes to the commonwealth to cherish, defend, and transmit unimpaired to his successors the office with which the commonwealth has seen fit to honor him. A judge, therefore, in vindicating the dignity and authority of the court over which he presides, is discharging a solemn duty owed in his official character, and is not engaged in a personal or private controversy."

Other authorities upon which these views are based are: *Burke v. The Territory,* 2 Okla. 449; *Ex parte Robinson* 36 U. S. 503; *Brown v. Buck,* (Mich.) 13 Amer. St. Repts. 438, Chief Justice Campbell; *Hale v. The State of Ohio,* (Ohio), 36 L. R. A. 254; *In re Sweeney,* (Nev.), 1 Pac. Rep. 381; *Brown v. People,* 19 Ill. 614; *Bradley v. State, ex rel.* Hill, (Ga.), 50 L. R. A. 691.

—8

It is contended that no temporary injunction ought to have been granted, and that when granted it should have been dissolved on motion of the defendant, because the petition did not state facts sufficient under the law to entitle the plaintiff thereto. The judge before whom the matter was heard had jurisdiction of the subject matter. It is no defense to a violation of the order to say that either, upon the pleading of the evidence, the order was erroneously granted. That was a proper matter for appeal, and until it was set aside upon rehearing or upon appeal, it was entitled to implicit obedience. (High on Injunction, 1417.)

The judge in chambers below found that the injunction was violated, and that it constituted a contempt of the jurisdiction from which it issued, and the cause will, therefore be remanded to the judge in chambers below to be proceeded with accordingly.

Hainer, J., who presided in the court below, not sitting; Burford, C. J., concurs in the results, but not in the reasons of law stated in the opinion; all the other Justices concurring.