EX PARTE McCOWN.

(Filed September 26, 1905).

*Habeas Corpus—Contempts—Summary Punishment—Powers of Court, Under the Statutes and at Common Law.*

1.  The writ of *habeas corpus* can never be made to perform the office of a writ of error or appeal. The investigation is confined to the question of jurisdiction or power of the judge to proceed as he did, and the merits of the controversy are not passed upon.

2.  In *habeas corpus* proceedings, this court is bound by the judge's findings of fact which were spread upon the record as required by the statute.

3.  The power to attach for a certain class of contempts being inherent in the courts and essential to their existence and the due performance of their functions, the Legislature cannot, as to them, deprive the courts of this power or unduly interfere with its exercise.

4.  The Act of 1871, as brought forward in The Code, sections 648-654, is, in respect to the law of contempt, as broad and comprehensive in its scope and meaning as the common law itself, so far as it relates to those "inherent powers of the courts, which are absolutely essential in the administration of justice."

5.  Where the respondent visited the judge at his boarding house, during a recess of the court, before the adjournment for the term, and assaulted the judge in consequence of a sentence pronounced at that term, *held*, that within the meaning of the statute, Code, sections 648-654, the conduct of the respondent was a direct contempt of the court as much so as if the assault had been made when the judge was sitting on the bench in open court.

6.  At common law, the conduct of the respondent constitutes a contempt of court, and if the statute, Code, sections 648-654, does not embrace this case and in terms repeals the common law applicable to it, this court would not hesitate to declare the statute in that respect unconstitutional.

Ex Parte McCown.

7.  In direct contempts, the proceedings are generally of a summary
    character and there is no right of appeal, the facts being stated
    in the committal, attachment or process and reviewable by *habeas
    corpus*, while in indirect contempts the proceedings are com-
    menced by citation or rule to show cause, with the right to
    answer and to be heard in defense, and also with the right of
    appeal.

The petitioner, M. E. McCown, was attached for contempt
by His Honor, *Judge G. W. Ward*, at the August Term,
1905, of the Superior Court of Durham County.  He was
adjudged in contempt and ordered to be imprisoned in the
county jail for thirty days and fined two hundred dollars.
Having no right to appeal from the decision (*State v. Mott*,
49 N. C., 449, *In re Davis*, 81 N. C., 72), he applied to the
writer of this opinion as a justice of this court for a writ
of *habeas corpus*, which was issued and made returnable be-
fore him on Monday, the 4th day of September, 1905.  At
the hearing, as counsel wished to avoid the necessity of two
arguments of the case and it was also desired, owing to the
great importance of the question and the peculiar circum-
stances of the case, that when the matter was heard in the
Supreme Court all the justices should sit, it was agreed that
argument should be waived and the matter should be decided
upon the papers and an appeal entered so that the case could
be heard at once in this court by a full bench—all defects
and irregularities in the manner of bringing the case before
this court for review being waived.  An order was thereupon
made remanding the petitioner to the custody of the sheriff
in further execution of *Judge Ward's* sentence, and the whole
matter has been brought into this court by exception and ap-
peal for full hearing and consideration, argument of counsel
being made here for the first time.  If a direct contempt was
committed, it is conceded that the respondent was properly
committed and fined and that the judgment is unassailable.
*Judge Ward's* findings of fact are as follows: "On Friday,
September 1, 1905, one Allen Haskins was put on trial for

murder in the second degree in the Superior Court of Durham County, over which the undersigned judge was presiding. The jury, on Saturday afternoon in the same week, rendered a verdict finding the defendant guilty of manslaughter, and at the same time recommended the defendant to the mercy of the court. Judgment was prayed by the solicitor. It appeared to the court that the defendant had already been confined in the common jail of Durham County for more than ten months awaiting trial. After due and careful consideration of the case, the court, in view of all the evidence, the recommendation of the jury, and the length of time that the prisoner had already been imprisoned in jail, sentenced the prisoner to fifteen months at hard labor upon the public roads of Durham County. There being still unfinished business of the court, the court between four and five o'clock p. m., announced that it would not adjourn court *sine die,* as there was other business to transact, and told the court crier to announce that the court was adjourned until further notice from the judge, which the crier accordingly did, and the court was left open for the transaction of further business. The judge then left the court room and went to his room at his boarding house near by. In a short while thereafter, to-wit, about six o'clock p. m., the respondent, M. E. McCown, came to the room of the judge and called him out on a porch adjoining his room. The judge responded and went on the porch to meet the respondent, whom he found perfectly rational, and who at once accosted him in a very angry and menacing manner, complaining of the judgment rendered in the case of State v. Allen Haskins, and demanded that the judge at once should impose a longer term than the one already announced, or turn the prisoner out of jail. The judge listened to the statement, and respectfully considered it, as the respondent stated that he was there to see him about this case. He then asked the respondent in a quiet and mild manner if he was accustomed to speaking to the judge in that

way, adding that in the course of the case he had exercised his best judgment and discretion in the matter. Whereupon the respondent began to curse the judge violently, using most offensive language and following it up with an assault on the person of the judge. The minutes were not signed, and the judge intended to return and sign the same, and did sign them later. The court was a one week term, and for the trial of criminal cases only, and all the jurors had been discharged before the assault by respondent was committed. The judge had transacted no other business after the adjournment, as above stated, before taking up this matter with the respondent on the porch, except to change the sentence of one defendant, and adjust a matter of cost in another case, which he did before he left the court room, but after the crowd had left.

The respondent was present in court in person, and represented by attorneys, Messrs. Guthrie & Guthrie and Fuller & Fuller, and the court was represented by the solicitor. The respondent filed no answer in writing, his counsel waiving the same after suggesting to the court other facts, which it included in the findings above."

*Fuller & Fuller* and *Guthrie & Guthrie* for the respondent.
*Robert D. Gilmer, Attorney-General,* and *A. L. Brooks,* contra.

WALKER, J., after stating the case: This matter, as now presented to us, really involves the correctness of the ruling of *Judge Ward* in the proceedings which resulted in the commitment of the respondent and the imposition of a fine upon him for contempt of court. If upon the facts, as found by the judge, a contempt was committed within the meaning and intent of the law upon that subject, or to express the same idea in somewhat different words and as it is usually stated, if the judge was in the exercise of a rightful juris-

diction in the particular case, his decision cannot be reviewed in a collateral way by the writ of *habeas corpus*. This court is bound by the judge's findings of fact, which were spread upon the record as required by the statute. *In re Deaton,* 105 N. C., 59; *Ex Parte Terry,* 128 U. S., 289. We cannot decide whether there was any merely erroneous ruling of the court or any irregularities in respect to judgment and procedure, as the writ of *habeas corpus* can never be made to perform the office of a writ of error or of an appeal. We are confined in our investigation to the question of jurisdiction or power of the judge to proceed as he did and cannot otherwise pass upon the merits of the controversy. There must have been a want of jurisdiction over the person or the cause or some other matter rendering the proceedings void, as this is the only ground of collateral attack. The law in this respect has been definitely settled, we believe, by all the courts. *Ex Parte Terry, supra; Ex Parte Savin,* 131 U. S., 267; Rapalje on Contempts, section 155. In *Ex Parte Reed,* 100 U. S., 13, the doctrine is thus clearly and concisely stated,: "A writ of *habeas corpus* cannot be made to perform the functions of a writ of error. To warrant the discharge of the petitioner, the sentence under which he is held must be not only erroneous, but absolutely void." The range of our inquiry, therefore, is narrowed to the question of jurisdiction and the validity of the order of *Judge Ward.* That the court had general jurisdiction of the subject of contempt cannot be denied; but do the facts stated in the record constitute a contempt within the meaning of the law? This is precisely the question now before us. We would have had less difficulty in deciding this case, if by the Act of 1871 (Code, sections 648 to 657), the Legislature had not defined contempts of court and declared that no other acts or conduct not mentioned therein should be "the subjects of contempt" and repealed the common law, in so far as it recognized as contempts other acts or conduct not specified in the statute. We

are satisfied that at common law the acts and conduct of the petitioner, as set out in the case, constitute a contempt of court, and if the statute does not embrace this case and in terms repeals the common law applicable to it, we would not hesitate to declare the statute in that respect unconstitutional and void, for reasons which we will now state. That courts have inherent power to punish summarily for any direct contempt has unquestionably been settled by the authorities. Blackstone (vol. 4, 283,) says that the method of punishing contempts by attachment has been immemorially used by the Superior Courts of Justice. Contempts that are thus punished are either direct, which openly insult or resist the powers of the court or the persons of the judges who preside there, or else are consequential, which (without such gross insolence or direct opposition) plainly tend to create universal disregard of their authority, and, after enumerating specially contempts which fall within the two descriptions, he says generally that they may be committed by anything, in short, that demonstrates a gross want of that regard and respect which, when once courts of justice are deprived of, their authority (so necessary for the good order of the kingdom) is entirely lost among the people, and he proceeds to say that the process of attachment for these and the like contempts must necessarily be as ancient as the laws themselves, for laws without a competent authority to secure their administration from disobedience and contempt would be vain and nugatory. The power therefore to suppress such contempts by an immediate attachment of the offender results from the first principles of judicial establishments and must be an inseparable attendant upon every superior tribunal and has been actually exercised as early as the annals of our law extend, and as such, is confirmed by the statute of Magna Charta, and, hence, he concludes that the power is not derived from any statute, not even Westminster II. (13 Edward I.), chapter 39, which was merely declaratory of the law of the land.

Bishop, in his work on Criminal Law (8th Ed.), volume 2, sections 242 and 243, lays down substantially the same doctrine in these words: "It is not possible for any judicial tribunal to fulfill its functions without the power to preserve order, and to enforce its mandates and decrees. And the common and apparently only practical method of doing these things is by the process of contempt. Therefore the power to proceed thus is incident to every such tribunal, derived from its very constitution, without any express statutory aid. The doctrine is generally asserted in these broad terms, and is believed to be sound; the narrower doctrine, about which there is no dispute, is that this power in inherent in all courts of record. As explained in the first volume, it is a common law offense to obstruct any course of the government or its justice. When, therefore, a man does anything which interferes with the judicial tribunal in the conduct of a cause, he commits an obstruction of a criminal nature. This is a common form of contempt of court."

In *King v. Almon*, 8 State Trials, 53, *Wilmot, C. J.,* says: "The power which the courts in Westminster Hall have of vindicating their own authority, is coeval with their first foundation and institution; it is a necessary incident to every court of justice, whether of record or not, to fine and imprison for a contempt of the court, acted in the face of it (1 Vent., 1), and the issuing of attachments by the Supreme Courts of justice in Westminster Hall, for contempts out of court, stands upon the same immemorial usage as supports the whole fabric of the common law; it is as much the *lex terrae,* and within the exception of Magna Charta, as the issuing any other legal process whatever. I have examined very carefully to see if I could find out any vestiges or traces of its introduction, but can find none; it is as ancient as any other part of the common law; there is no priority or posteriority to be discovered about it, and therefore it cannot be said to invade the common law, but to act in alliance and

friendly conjunction with every other provision which the wisdom of our ancestors has established for the general good of society." "Every court of record," says Bacon in his Abridgement (Courts, E), vol. 2, pages 633-634, "as incident to it, may enjoin the people to keep silence, under a pain, and impose reasonable fines, not only on such as shall be convicted before them of any crime on a formal prosecution, but also on all such as shall be guilty of any contempt in the face of the court, as by giving opprobrious language to the judge, or obstinately refusing to do their duty as officers of the court, and may immediately order them into custody. The courts of record, as incident to them, have a power of protecting from arrest, not only the parties themselves, but also all witnesses *eundo et redeundo;* for since they are obliged to appear by the process of the court, it would be unreasonable that they should be molested whilst paying obedience to it." 1 Hawkins's Pleas of Crown (8th Ed.), p. 63. *McKean, C. J.,* forcibly summarized the doctrine more than a century ago (1788), in *Respublica v. Oswald,* 1 Dal. (Pa.), 319, when he said: "Some doubts were suggested, whether, even a contempt of the court was punishable by attachment; but, not only my brethren and myself, but likewise all the judges of England think that without this power, no court could possibly exist—nay, that no contempt could, indeed, be committed against us, we should be so truly contemptible. The law upon the subject is of immemorial antiquity; and there is not any period when it can be said to have ceased or discontinued. On this point, therefore, we entertain no doubt." It was held in *Cartwright's case,* 114 Mass., 230, that the right summarily to commit and punish for contempts tending to obstruct or degrade the administration of justice is inherent in courts as being essential to the exercise of their jurisdiction, to the execution of their powers and to the maintenance of their authority. It is therefore a part of the fundamental law within the meaning and intent of Magna Charta

and the Declaration of Rights in our Constitutions against depriving any person of life, liberty or property, except by the judgment of his peers or the law of the land, and is not contrary to any guarantee of trial by jury or due process of law. The language of the court in *Cooper's case,* 32 Vt., 257, is peculiarly applicable to the facts of our case. "The power to punish for contempt," says the court, "is inherent in the nature and constitution of a court. It is a power not derived from any statute, but arising from necessity; implied, because it is necessary to the exercise of all other powers. It is indispensable to the proper transaction of business. It represses disorder, violence and excitement, and preserves the gravity, tranquility, decorum and courtesy that are necessary to the impartial investigation of controversy. It secures respect for the law by requiring respect and obedience to those who represent its authority. Its exercise is not merely personal to the court and its dignity; it is due to the authority of law and the administration of justice. The power to punish for contempt is indispensable to the proper discharge of their duties by magistrates. Without it the magistrate would be in a pitiable condition, compelled to hold court, to investigate controversies, examine witnesses and listens to arguments and yet powerless to secure order in his proceedings, to enforce obedience to his decisions, to repress turbulence, or even to protect himself from insult. The mere power to remove disorderly persons from his court room would be wholly inadequate to secure, either the proper transaction and dispatch of business, or the respect and obedience due to the court and necessary for the administration of justice." In *Ex Parte Terry,* 128 U. S., 289, where most of the authorities are collected, the court, affirming the rulings to be found in its earliest decisions, holds that certain implied powers result to courts of justice from the very nature of their constitution, and thus they possess the power to fine for contempt, imprison for contumacy and enforce the observance of

order. "Courts of justice are universally acknowledged to
be vested, by their very creation, with power to impose
silence, respect and decorum in their presence, and submis-
sion to their lawful mandates. The power to punish for
contempts is inherent in all courts; its existence is essential
to the preservation of order in judicial proceedings, and to
the enforcement of the judgments, orders and writs of the
courts, and consequently to the due administration of jus-
tice." The moment that courts are called into existence and
vested with purisdiction over any subject, they become in-
vested with this power. This doctrine of the law is well
stated in *Clark v. People,* Breese (Ill.), 340, which is also
reported in 12 Am. Dec., 177, where will be found a valuable
note collating the principal cases on the subject. Rapalje,
in his work on Contempts (section 1 and notes), says: "It
is conclusively settled by a long line of decisions that at com-
mon law, all courts of record have an inherent power to
punish contempts committed in *facie curiae,* such power be-
ing essential to the very existence of a court as such
and granted as a necessary incident in establishing a tribunal
as a court." The doctrine has been fully recognized by this
court. In *State v. Woodfin,* 27 N. C., 199, *Ruffin, C. J.,* for
the court, says: "The power to commit or fine for contempt
is essential to the existence of every court. Business cannot
be conducted unless the court can suppress disturbances, and
the only means of doing that is by immediate punishment.
A breach of the peace in *facie curiae* is a direct disturbance
and a palpable contempt of the authority of the court. It is
a case that does not admit of delay, and the court would be
without dignity that did not punish it promptly and without
trial. Necessarily there can be no inquiry *de novo* in another
court, as to the truth of the fact." *Ex Parte Summers,* 27
N. C., 149; *Ex Parte Schenck,* 65 N. C., 366; *Pain v. Pain,*
80 N. C., 322; *In re Oldham,* 89 N. C., 23; *Kane v. Hay-
wood,* 66 N. C., 1. From this doctrine so firmly established

and from the reasoning of the authorities cited in its support, it must necessarily follow that, as the power to attach for a certain class of contempts is inherent in the courts and essential to their existence and the due performance of their functions, the Legislature cannot, as to them, deprive the courts of this power or unduly interfere with its exercise. The Constitution provides for a distinct separation of the three co-ordinate branches of the government and vests the judicial power in the several courts mentioned in Article IV., section 2. It further provides that the General Assembly shall not deprive the judicial department of any power or jurisdiction which rightfully pertains to it. Article IV., section 12. If the power to attach for a direct contempt is inherent in the courts and necessary to their vitality and usefulness, any interference with its exercise which prevents the courts from proceeding against contumacious or disorderly persons must needs be a deprivation of the power. But argument is not required to establish so plain a proposition. Rapalje, at page 13, section 11, says: "In the absence of a constitutional provision on the subject, the better opinion seems to be that legislative bodies have not power to limit or regulate the inherent power of courts to punish for contempt. This power being necessary to the very existence of the court, as such, the Legislature has no right to take it away or hamper its free exercise. This is undoubtedly true in the case of a court created by the Constitution. Such a court can go beyond the provisions of the statute, in order to preserve and enforce its constitutional powers, by treating as contempts acts which may clearly invade them. On the other hand, the Circuit and District Courts of the United States, being the creatures of Congress, their powers and duties depend upon the act calling them into existence, or subsequent acts extending or limiting their jurisdiction." In *Ex Parte Schenck,* 65 N. C., 366, a case which has frequently been cited with approval, and a case, too, in which the validity of

the Act of 1871 was recognized to a certain extent, it is said: "Courts of justice are established by the Constitution, and are invested with certain inherent powers, which are essential to their existence, and of which they cannot be deprived by the Legislature. Their province is to construe existing laws and to administer justice, and they must necessarily have the power by summary remedies to preserve order during their sessions, control the action of their officers, and enforce their mandates and decrees. If the courts could be deprived by the Legislature of these powers, which are essential in the direct administration of justice, they would be destroyed for all efficient and useful purposes." In *Holman v. State,* 105 Ind., 515, the court states what it declares to be the principle settled by the words of the Constitution as well as by actual decision: "The power," says the court, "to punish for direct contempts is inherent in all courts of superior jurisdiction. This power is not conferred by legislation, but is an inherent power residing in all Superior Courts. It is a power that the Legislature can neither create nor destroy. It is as essential to the preservation of the existence of courts as is the natural right of self-defense to the preservation of human life. The judicial is a co-ordinate department of the government, and courts are not the mere creatures of the Legislature, for, if they were, the judicial department would be a subordinate one, dependent for existence and power upon the will of the Legislature. This is not, as the Constitution expressly declares and the united voice of the courts affirm. As it is a co-ordinate branch of government, and as judicial power can only live in the courts, it must follow that courts possess inherent powers which they do not owe to the Legislature, and among these powers is that of the right to punish direct contempt. This subject has been many times discussed, and the doctrine often affirmed, without diversity of judicial opinion, that courts do possess power to punish contempts independent of legislation, and that this power is one that the Legislature

can neither destroy nor abridge." This court said in *Deaton's case*: "So inherent is the power to attach for contempt, that the Legislature would have no power to deprive the courts of its exercise." And in *Herndon v. Insurance Co.*, 111 N. C., 384, it was held that the Supreme Court was created by and derives its power and jurisdiction from the Constitution. Its mandate comes from the people and the source of its authority is the same as that of the legislative and executive departments. "The same organic law which gives the Legislature power to make rules and regulations for the orderly and regular dispatch of business in its sessions, free from the control or interference of the executive or of this court, gives the like power over its own procedure to this court, free of interference from either of the other co-ordinate branches of government. Neither body has shown any disposition to encroach upon the constitutional prerogatives of this court." The power of the Legislature to require this court to rehear a case otherwise than is prescribed by its own rules of practice and procedure was denied in that case. The Superior Court, being a constitutional body, must be governed by the same law as this court, and is under the same protection from legislative interference, so far at least as its inherent rights and powers are concerned, which are specially shielded by the Constitution against infringement. *In re Woolley*, 74 Ky., 98; *People v. Wilson*, 64 Ill., 196; *State v. Morrill*, 16 Ark., 384; *State v. Kiser*, 20 Oregon, 56. See also *Scott v. Fishblate*, 117 N. C., 265, in which the inherent power to punish summarily for contempt was said to reside even in a mayor of a town as being necessary to the very existence of the court. The validity of the Act of 1871 was settled by *Ex Parte Schenck*, "with certain savings in respect to the inherent rights of the court," said this court by *Pearson, C. J.*, in *Kane v. Haywood*, 66 N. C., 31. That is, its operation was restricted to those contempts which are constructive and the right to attach for which is not essential to

the full and free exercise of the powers and jurisdiction conferred upon the courts by the Constitution. It would be useless to multiply authorities in support of this reasonable and necessary doctrine that the Legislature cannot deprive the courts of any of their vital powers, such as are requisite for their preservation and for their protection from unlawful interference in the exercise of their jurisdiction and the performance of their judicial functions. The doctrine is recognized as perfectly sound and well settled in all the cases we have cited, and is a logical deduction from the other proposition that the power to attach for contempt is inherent. If, therefore, the Legislature by the Act of 1871 (Code, sections 648-654), had attempted to destroy or abridge this power, it would become our duty to declare the act to that extent void and of no effect.

The Legislature has the same inherent power to preserve order and to attach for any act which tends to interrupt its deliberations and proceedings or which is committed in contempt of its authority, as is vested in the courts. Rapalje, section 2. With the lawful exercise of this undoubted power, the judiciary will not interfere. It is recognized as being necessary to the proper and orderly transaction of its business and is clearly implied from the other powers conferred and duties imposed upon that honorable body, under the elementary and familiar rule that, when a power is given, every other power necessary to its execution is to be considered as also granted. As we will not attempt to restrict or regulate the exercise of this power, and it would not be seemly to do so, we will not assume that the Legislature intended to trench upon the right which inherently belongs to the courts to protect themselves, by punishing those who unlawfully obstruct their proceedings or act in contempt or defiance of their authority.

But fortunately we are relieved from the necessity of deciding the question by the fact that this court has construed

that statute, and held that it "does not take away any of the
inherent powers of the courts, which are absolutely essential
in the administration of justice, and is not such an encroach-
ment upon the rights of the judicial department of the gov-
ernment as to warrant us in declaring it to be unconstitu-
tional and void." *Dick, J.,* in *Ex Parte Schenck,* 65 N. C.,
368. In view of what the court had before said in that case,
which we have already quoted, it must be taken as settled
that the Act of 1871, as brought forward in The Code, sec-
tions 648-654, is, in respect to the law of contempt, as broad
and comprehensive in its scope and meaning as the common
law itself, so far as it relates to those "inherent powers of
the courts, which are absolutely essential in the administra-
tion of justice."

With these observations as to the power of the courts, let
us now inquire whether the facts found by the judge and
"specified on the record" show that the petitioner has com-
mitted a contempt, within the meaning of the Act of 1871
and the common law, for which he could be summarily pun-
ished. There is no case to be found precisely like this one
in all of its facts and circumstances. Insults to judges and
assaults upon them, while in the discharge of their official
duties, in resentment for some imagined grievance growing
out of their official action have been so rare, be it said to the
credit of a law-abiding and law-respecting people, that it is
difficult to find an exact precedent for our ruling in this mat-
ter, but authority is abundant in support of the principle upon
which our decision must rest. If the respondent has not
committed a contempt of court for which he can be sum-
marily punished, we might well join with *Lord Langdale* in
his assertion that without such a power in the court, "it will
be impossible that justice can be administered. It would be
better (in such circumstances) that the doors of justice were
at once closed." *Littler v. Thompson,* 2 Beavan, 129. He
was there speaking of an attack upon a party to a cause then

pending.   How much more aggravated is one made upon the
presiding judge of the court.   The same idea is advanced in
*Ex Parte McLeod,* 120 Fed. Rep., 130, a case much like ours
in its facts, if it does not fully cover the very question here
involved.   It there appeared that a commissioner had been
assaulted by a party of whom he had required an appearance
bond.   With reference to these facts, it was substantially
said that, as courts can exercise judicial functions only
through their judicial officers, an assault upon such an officer
because he has discharged a required duty is necessarily an
attack upon the court for what it has done in the administra-
tion of justice.   It is vital to the welfare of society that
courts, which pass upon the life, liberty and property of the
citizen, be free to exercise their reason and conscience unawed
by fear or violence; and the highest considerations of the
public good demand that the courts protect their officers
against revenges induced in consequence of the performance
of their duties, as well as violence while engaged in the
actual discharge of duty.   It is a high contempt of court to
seek to punish a judicial officer for his official act, elsewhere
than before a constitutional tribunal of impeachment.   The
evil is that the judge has been held to accountability for his
judicial acts and punished contrary to the law because he
has performed them.   That acts like this, which degrade the
judicial office, unfit the incumbents for calm deliberation,
awe them in the exercise of their functions, and undermine
their independence, must recoil fearfully on the orderly and
decent administration of justice, cannot be denied.   Who
would have any respect for the authority of a court whose
judge, the moment he left the court house, could be subjected
with impunity to insult and assault because of acts done in
his judicial capacity while on the bench?   Is it in the power
of any person, by insulting or assaulting the judge because
of official acts, if only the assailant restrains his passion until
the judge leaves the court building, to compel the judge to

forfeit either his own self-respect and the regard of the people by tame submission to the indignity (without summarily arraigning the culprit), or else set in his own person the evil example of punishing the insult by taking the law into his own hands? If he forbears for the time and resort to the criminal law, the remedy is hardly better than the wrong, since then he must become a private prosecutor in some other court and depend on it to vindicate the independence of his own.

We will now refer to a case which at least one eminent judge has pronounced to be "the ablest case on the law of contempts to be found in the books." *Hammond, J.,* in 120 Fed. Rep., at p. 772. It is the case of *Commonwealth v. Dandridge,* 2 Va.., cases 408. The respondent who was interested in the event of the suit, then pending in the court over which the judge presided, met the latter on the steps of the court house as he was returning from his chambers to open court and grossly insulted him, charging him with corruption in the trial of the case. The court was not actually in session but in recess. It was adjudged to be a contempt for which summary punishment could be inflicted. "Judicial independence," says the court by *Dade, J.,* "has been an object of constitutional care in this country. In the origin of this government it was thought expedient to make that department independent even of the executive and legislative branches, who are not presumed to do wrong; and shall it be said that it is wholly unnecessary to make it independent of the passions and prejudices of all who may conceive themselves injured by its legitimate proceedings? Shall a judge be called independent who is unavoidably placed in a situation in which he comes in conflict with the jealousies and resentment of those upon whose interests he has to act, and be reduced to the alternative of either submitting tamely to contumely and insult, of resenting it by force or resorting to the doubtful remedy of an action at law? In such a state

of things it would rest in the discretion of every party in court to force the judge, either to shrink from his duty or to incur the degradation of his authority, which must unavoidably result from the adoption of either of the above alternatives. To assume that the personal character of the judge would be a sufficient guarantee against this, is to imagine a state of society which would render the office of the judge wholly unnecessary." In another part of the opinion, this able and scholarly judge said: "When I see the juror and the witness protected from insult for what they may have said or done in court, I ask whether it is more necessary to defend these characters, who may perhaps never be again called into a court of justice, than the judge, who must be so often exposed to similar trials. When in all these cases I find the great object to be the preservation of the authority, dignity, impartiality and independence of the judiciary, without which it has been said it could not exist, or if existing would be a curse rather than a blessing, I cannot feel justified in excepting a case which is in all its particulars in direct hostility to this principle, because I cannot back my opinion by a reported case." After citing Blackstone and numerous other authorities he proceeds: "With this array before our eyes, can it be credited that it should be so highly penal to assault or abuse a judge in court for his judicial proceedings, and no offense to do the same thing to him the moment after his leaving the bench, on account of the same provocation? Can it be considered a matter of so much consequence to protect the person of the suitor, the lawyer, the witness, the juror and the jailer, and none to defend the judge? Not that I mean to arrogate any higher personal privilege for the judge than for the humblest of these, but because it is obvious that the principle which suggests the necessity for protecting them rises with the grade of the officer, and that the majesty of the laws may be more degraded in the person of the highest than of the lowest officer

intrusted with their administration." *Judge White,* who wrote a separate concurring opinion, answers the argument there made by the respondent's counsel, and now advanced in this case, in very forceful words: "It is contended that in general and upon principle no contempt can be committed in any court unless it be in session at the time, and the contempt be committed in its face. And that no contemptuous words spoken to or of a judge, during the recess or vacation of his court, however deeply they may implicate his judicial conduct, can be thus punished. The argument upon this point was specious and imposing. Whether it was substantially correct, and whether the result endeavored to be produced by it be in accord with either the public good or the great principles of law long since established (not for the private gratification of the judges, but to insure the well being of society) is another question—a question of solemn import to every man who looks to the laws of his country for the preservation of all he holds dear. We cannot prostrate the courts of the country at the feet of every disappointed suitor who may happen to lose his cause, or whose conduct may necessarily elicit from a judge observations unpleasant to his feelings, without the most fatal consequences. Nay, destroy the protection which the law now gives to your court, unloose the hands and tongues of such persons, expose your magistrates to their abuse, contumely and vituperation for their judicial conduct without any immediate and efficacious means of restraint, and instead of that happy, dignified and peaceful state of society which we now enjoy, we shall soon find that we have neither laws nor magistrates; and let it be remembered that in this country we ought not to have, we have not, any privileged order of men. If one man is restrained from such conduct, every man must be subject to a like restraint. If one man is at liberty to pursue it, every other man must enjoy the same liberty."

We might well stop here and rest our decision upon the

139——8

reasoning in that case and the deduction of that able court that in such a case as the one there and here presented, an attachment for a direct contempt will lie and punishment can be summarily imposed. But we are impressed and the court was in that case, with the great importance of the question which induces if it does not require us, especially in view of the ability and zeal with which counsel have argued before us, to investigate fully this doctrine of attachment for contempt and deliberately and maturely weigh the reasons for and against it, aided by the learning we find in the books, to the end that our conclusion may be formed after the most careful thought and deliberation, and with due regard for the maintenance of the rightful powers of the courts as well as the preservation of the personal liberty of the citizen. If, in an attempt to do this, more time is consumed than we could wish, an apology will be found in the desire we have to reach a just and safe conclusion.

When we use the term "attachment for contempt" it must be understood that we refer to the summary proceeding and not to the remedy by citation or rule to show cause when the contempt is indirect or constructive and the offense can now be punished only "as for a contempt," as provided by the statute, Code, section 654. With this explanation of a term we proceed to the further discusison of the authorities.

In *U. S. v. Anonymous,* 21 Fed. Rep., 761, where the question here involved is examined at great length in a well considered opinion by *Judge Hammond,* who reviews the cases with marked discrimination and sustains his views by the most cogent reasoning, it is held that "where the act or conduct takes the form of an assault upon an officer, as when he was beaten and made to eat the process and its seal, the impediment to the efficient administration of justice may be quite as direct in its operation to that end, happen where it may, as if the party had ridden his horse to the bar of the court and dragged the judge from the bench to beat him.

Be this as it may, wherever the conduct complained of ceases to be general in its effect, and invades the domain of the court to become specific in its injury, by intimidating or attempting to intimidate, with threats or otherwise, the court or its officers, the parties or their counsel, the witnesses, jurors and the like, while in the discharge of their duties as such, if it be constructive because of the place where it happens, yet, because of the direct injury it does in obstructiong the workings of the organization for the administration of justice in . that particular case, the power to punish it has not yet been taken away by any statute, however broad its terms may apparently be." This is a very important case and a strong authority, as in it the court construes the Act of Congress of 1831 upon the subject of contempts, which greatly limited the power of the Federal Courts to punish summarily for contempts and confined it to misbehavior in the presence of the court or so near thereto as to obstruct the administration of justice, and misbehavior of the officers of the court and disobedience or resistance to its process. The act, if anything, is more restricted in its provisions that our statute, Code, sections 648-654, and yet it was held in the case cited that it was not necessary that the offensive act should have been committed in the immediate presence of the court while actually sitting in the court house with the judge on the bench, but though merely constructive because of the place where it is committed, it becomes a thing done *in facie curiae* within the meaning of the statute, if it affects an officer in the discharge of his duty and directly tends to obstruct the proceedings of the court or the administration of justice. It is generally understood that the object of the act of Congress was to enlarge the liberty of criticism by the press and others by curtailing the power to punish adverse comments upon the Federal Courts, their officers and proceedings. *U. S. v. Anonymous,* 21 Fed. Rep., at p. 768; *Ex Parte Poulson,* 19 Fed. Cases No. 11,350; *Cuyler v. Railroad (In re Daniels),*

131 Fed. Rep., 95. In other respects the common law prevails as it did under the Act of 1789, as to all contempts committed in the presence of the court. Cases *supra*.

In *U. S. v. Patterson,* 26 Fed. Rep., 509, where it appears the respondent had assaulted an attorney in the court room during the recess of the court, it was held that he could be attached for contempt, the court assigning the following reason: "The mistake of the respondent was in assuming that when the judge left the bench, he might, so far as the court was concerned, proceed to accomplish his purpose of making the assault, supposing that it was only when the judge was on the bench that any question of contempt could arise. But it must be apparent to every one that this is a misconception, and far too restricted to admit of approval anywhere. The court would deserve the contempt of public opinion if it permitted so narrow a view of its prerogatives to prevail, and could not complain if during its recess the court room should be used for a cock pit or a convenient place to erect a prize ring. That is the logic of the false assumption that was made in this case. But wholly aside from this consideration, there is a principle of protection to all who are engaged in and about the proceedings of a court that requires preservation against misbehavior of this kind. The defendant in court whose attorney was attacked is entitled to the protection of the court against any personal violence towards its attorney, while he is in attendance on the court. Otherwise, attorneys might be driven from the court or deterred from coming to it, or be held in bodily fear while in attendance, and thereby the administration of justice be obstructed. This principle might be pressed beyond reasonable limits, to be sure, but it certainly is not going beyond the true confines of the doctrine to apply it here. It protects parties, jurors, witnesses, the officers of the court and all engaged in and about the business of the court even from the service of civil process while

in attendance, and certainly should protect an attorney at the bar from the approach and attack of those who would do him a personal violence. A former ruling of this court on that subject has been especially approved by very high authority."

Lord Cottenham committed to the Fleet for contempt a barrister who was also a member of Parliament and who had.threatened a master in Chancery with a view of inducing him to reverse his decision, upon the ground that his conduct tended to pervert the course of justice and to obstruct its due administration. This ruling was approved by the House of Commons upon the report of its Committee of Privileges, and the claim to be discharged by reason of privilege was disallowed. A like decision was made by *Lord Eldon,* when a witness was interfered with, in *Ex Parte King,* 7 Vesey. (ch.) 315; and also in *Ex Parte Burrous,* 8 Vesey (ch.) 535, when violence was committed in one of the offices of the court, though not in its immediate presence. The Court of Chancery in *Williams v. Johns,* 2 Dickens, 477, attached the defendant for having compelled the officer, who had served him with a subpœna, to eat the same and otherwise ill treating him. In each of these cases the offense was regarded as a criminal contempt by reason of its direct tendency to thwart the administration of justice, as much so as if it had been committed in the very "face of the court." It was held in *State v. Garland,* 25 La. Ann., 532, that the use of abusive language towards a member of the court and an assault upon him during a recess, and in the court room, under the pretext of resenting what he had said or done when on the bench, was a direct and aggravated contempt of the court for which he could be summarily punished, and in *Baker v. State,* 82 Ga., 776, it was held that a court was not dissolved by a mere recess or necessary adjournment from one day to the next, and misbehavior affecting public justice in the court room and in the immediate presence of the judge

during such a recess, and whilst he is attending there to re-sume business but before the hour of recess has expired, was a contempt committed in the presence of the court and pun-ishable summarily. The court, by *Bleckley, C. J.,* said: "What right did he, the respondent, have to discuss his case if the court was not in session? And what right did he have to do it in an improper manner if it was in session? It was urged in the argument before us that he was merely complain-ing to the judge, and in so doing was in the exercise of a legal right. But what law confers on a suitor the right to converse about his case with the judge out of court? Are the State's judges to be questioned by suitors about their cases and listen to complaints elsewhere than in court? We think not. The office of judge would be intolerable to the holder and degrading to the State, were the incumbent subjected by law to personal and private approach, questioning and harass-ment at the will of anxious and discontented suitors. The only place for intercourse with a judge, touching business pending in court, is the place where the court sits, and the only time for it is during the sitting."

In *People v. Wilson,* 64 Ill., 195, it is held that the power to punish for contempts is an incident to all courts of justice, independent of any statutory provision. Referring to the statute of that State attempting to restrict the power of the courts in this respect, it was further held that if the statute should be regarded as a limitation upon the power of the court to punish for any other contempts than those committed in its presence, yet in this power would necessarily be in-cluded all acts calculated to impede, embarrass or obstruct the court in the administration of justice, and such acts would be considered as done in the presence of the court. See also on the subject of contempts not committed in the court room, *Ex Parte Savin,* 131 U. S., 267; *In re Cuddy, ibid.,* 280; *In re Healey,* 53 Vt., 694; *Littler v. Thompson,* 2 Beavan, 129; *In re Bary* (note), 10 Fed. Rep., 630; *Wel-*

*lesley's case,* 2 Rus. & Mylne, 639. In *Rex v. Wigley,* 7 Car. & P., 4 (32 E. C. L., 415), it appeared that a witness in a prosecution, tried at the King's Bench sittings, struck the defendant after the trial was over, when both were in the lobby of the court. The witness being brought to the bar and evidence given of these facts, the judge (*Coleridge*) committed him to the custody of the marshal for three days for this contempt of the court. So in the case of *In re Pryor,* 18 Kan., 72, the facts were that an attorney had sent to a judge, out of court, a letter of an insulting character and containing an imputation upon his integrity with reference to a cause which was being tried before him, and it was held to be a contempt of court and one which could be summarily punished. "If the language or conduct of the attorney is insulting or disrespectful," says the court by *Brown, J.,* "and in the presence, real or constructive, of the court, and during the pendency of certain proceedings, we cannot hold that the court exceeded its power by punishing for contempt." In *Savin's case* and in *Cuddy's case, supra,* the offense was not committed in the immediate presence of the court, but in a room in another part of the court house, which was held to be within the precincts of the court and in its constructive presence and the offender therefore subject to summary punishment. 131 U. S., 267 and 280.

A case more like ours perhaps than any other is that of *State v. Steube,* 3 Ohio C. C., 383, first heard below and then on appeal, the full report of which is not accessible to us. The facts appear to have been that, during a recess of the court, the prosecuting attorney was without provocation assaulted by a witness in a criminal case then pending, he being also a defendant in a like case not yet called for trial. The assault was made at a place about five blocks from the court house and grew out of the attorney's conduct in the pending case. The statute of Ohio provides that a person, guilty of misbehavior in the presence of a court, or of a judge

at Chambers, or so near as to interrupt the proceedings or
to ·obstruct the administration of justice, may be punished
summarily.   It was held that the case was within the terms
of the statute and the respondent was properly punished in
a summary manner.   Another case very similar in its facts
is *In re Brule,* 71 Fed. Rep., 943, in which it appeared that
the respondent had bribed a witness at the latter's residence.
The court held that, even within the words of the act of Con-
gress, it was a direct and not a constructive contempt for
which summary punishment could be meted out.   It cites and
relies on *Savin's* and *Cuddy's cases,* among others, and perti-
nently inquires "if it is a contempt to bribe a witness in front
of the court house, is it not a contempt to attempt to do the
same thing on the street opposite the court building or even
four blocks away ?   Is not the result the same ?   Is not the
motive of the accused the same ?"·  How, we ask, can the mere
element of distance change the character of the act or take
from it the quality of being a direct offense against the au-
thority of the court and a palpable obstruction to the admin-
istration of justice ?   A ruling which would ignore the com-
plete identity of the two kinds of offenses would sacrifice the
substance to the form.   *Qui haeret in litera haeret in cortice.*
In *Ex Parte Summers,* 27 N. C., 149, an officer had refused
obedience to an order to return process in his hands, and ac-
companied his refusal with an insolent message to the court.
Commenting on these facts, the court, by *Ruffin, C. J.,* said :
"But had there been no legal default, and admitting that this
person might have insisted before the court, on the delay of
the return to the next day as his absolute right, yet the
message to the court, in its terms and manner, *and while he
was in the verge of the court* (italics ours), was as offensive
and disrespectful as it could be, and in itself justified the
fine."

We have thus reviewed at much length the authorities
bearing either directly or indirectly upon the important and

delicate questions under consideration and have found abundant support, as we think, for the conclusion we have reached, that within the meaning of our statute, Code, sections 648-654, the conduct of the respondent was a direct contempt of the court, as much so as if the assault had been made when the judge was sitting on the bench in open court. The insult was given and the assault made "within the verge of the court," as aptly expressed by *Chief Justice Ruffin* in *Summer's case.*

It may well be doubted if the case of *In re Gorham,* 129 N. C., 481, is not in conflict with that of *In re Oldham,* 89 N. C., 23, and does not virtually overrule it, though it may not in terms have done so. Indeed we doubt if the *Oldham case* can well be sustained in view of the principles herein stated and the authorities relied on. The court, in that case, held that there was no contempt at all and that the offense could only be punished by indictment, while in *Gorham's case* it was held that the attempt to corrupt a juror could be punished as for a contempt, it being an unlawful interference with the proceedings of the court in an action, which tended to defeat, impair, impede or prejudice the rights of a party thereto, within the meaning and intent of The Code, section 654, subsection 3, and section 656, the only difference between the two cases being that, in *Oldham's case,* the offense consisted in handing to a person summoned as a juror printed circulars containing matter calculated to prejudice the jurors against the defendant, in a cause then pending, with a request that he would distribute them among the jurors during the term, while in *Gorham's case,* the offense was committed during the term, though in the recess of the court. We perceive no practical difference between the two cases. Indeed, we think that in both cases, if the respondents were not guilty of a contempt, under section 648 of The Code, which could have been punished summarily, because of the direct interference with the proceedings of the court and contempt of its

authority, continuing to the very moment of the trial of the cases, Oldham, as well as Gorham, was at least guilty under section 654, subsection 3, and section 656, upon the facts found and stated in the record. What difference can there be, under the latter section, between corrupting jurors during the term of the court and unlawfully influencing one of their number before the term, with the understanding that he will in turn influence his fellows during the term to decide a particular way? *Qui facit per alium, facit per se.* Does not the one as directly tend to pervert or defeat the administration of justice as the other, and is not the one as much a contempt of the authority and dignity of the court as the other?

In both classes of contempts, the punishment is of the same kind, a fine not to exceed two hundred and fifty dollars and imprisonment not to exceed thirty days, but in direct contempts, the proceedings are generally of a summary character and there is no right of appeal, the facts being stated in the committal, attachment or process and reviewable by *habeas corpus,* while in indirect contempts the proceedings are commenced by citation or rule to show cause, with the right to answer and to be heard in defense, and also with the right of appeal.

The statute provides (section 648) that direct contempts shall consist in "disorderly, contemptuous or insolent behavior committed during the sitting of any court of justice, in immediate view and presence of the court and directly tending to interrupt its proceedings, or to impair the respect due to its authority," and "any breach of the peace or noise or other disturbance tending to interrupt the proceedings of any court," and these and other acts and neglects, not necessary to be here mentioned, are declared to be the only acts and neglects which shall be the subjects of contempt of court. Tested by reason and authority, we think the statute must be so construed as to embrace the case presented in this record. If we thought otherwise and that resort to the common law

Ex PARTE McCown.

is necessary to protect the judge from insult and to shield him against assault for his judicial acts, we would not permit the statute to stand in our way. As said by the present Chief Justice in his concurring opinion in the case of *In re Gorham,* 129 N. C., 491, with reference to this very statute: "It cannot be justly imputed to the General Assembly that it passed an act intended or so worded as to justly mean that the administration of justice can be defeated, impaired and impeded. Were it possible that such an act had been passed, it would be our duty to declare it unconstitutional and with as great reason as the court has ever done so in any case." And in this connection, other words of his in that opinion are equally applicable to the facts of this case as they were to the case then being decided: "The contempt," he says, "could not be more direct or palpable if a band of armed men had followed the jury to the court house with threats of violence if their verdict was unfavorable, and had stood just outside the door to execute punishment if disappointed. It is equally a contempt of court whether a man meets a juror just outside the court house with a bribe or a bludgeon in his hand. If the court cannot prevent either because not done within the court room, the administration of justice is no longer free. The independence of the judiciary no longer exists." While this court will always be disposed to safeguard the personal liberty of the citizen and enforce all constitutional guarantees in his favor even to the extreme limit, it must at the same time look to its own preservation, as the power of the court to protect itself is a part of the supreme law, and the corresponding duty plainly enjoined to exercise this power, whenever necessary, is as imperative if not as mandatory as any other obligation resting upon it under the Constitution. The courts derive their authority and jurisdiction from the people through the organic law, and the respect of the people for and their confidence in their judges are absolutely essential to the maintenance of that

power and authority. They are the foundation upon which the whole fabric rests, and whoever impairs either of the former to that extent threatens the very existence of· the latter. In *Durham v. State,* 6 Iowa, 254, it is well said that the power given to the courts to punish for contempts is not alone for their own protection, but also for the safety and benefit of the public. The life, liberty and property of every citizen are ·preserved and the true welfare of society insured and promoted in the preservation of this power in its proper vigor and efficiency.

We conclude the discussion with the language of *Chancellor Kent,* when speaking of the exemption of a judge from civil liability for his judicial acts, which is peculiarly applicable to this case, as the prosecution of a judge for a wrong, alleged to have been committed in the execution of his office, is assuredly less harmful than an unprovoked assault upon his person. "Whenever," said the chancellor, "we subject the established courts of the land to the degradation of private prosecution, we subdue their independence and destroy their authority. Instead of being venerable before the public, they become contemptible, and we thereby embolden the licentious to trample upon everything sacred in society and to overturn those institutions which have hitherto been deemed the best guardians of civil liberty." *Yates v. Lansing,* 5 Johns, 282.

The cases cited by the petitioner's counsel are not in point. *Delafield v. Construction Co.,* 115 N. C., 21; *Hinton v. Ins. Co.,* 116 N. C., 22. The judge had not left the bench for the term, as in those cases it appeared he had done, but by express direction the court was kept open for the transaction of other business, the signing of the minutes and some unfinished matters.

Having disposed of the legal questions involved, we cannot take leave of the case without commending the able and fearless judge who presided in the Superior Court for the

perfect control and complete mastery of himself, which he exhibited under most trying and exasperating circumstances. His subordination of self, in deference to the dignity of his high office, is worthy of the highest praise and must command at once for him the respect, confidence and admiration of all. It was the best tribute he could have paid to the judiciary and the most perfect example he could have presented to the people of one of their chosen representatives in judicial station, who, tested by the severest ordeal, admirably sustained its dignity and by his own submission and self-restraint enhanced the respect due to the power and the majesty of the law. Guided by the same spirit which prompted Lord Coke's simple but impressive answer to his king, when he was asked by him out of court and in advance, what his opinion, as Chief Justice, would be concerning the extent of the royal prerogative, we can safely expect that whenever occasion requires "he will always do that which shall be fit for a judge to do." In the proceeding before him, and he was the proper and indeed the only judge to initiate it, he was fully within the pale of his jurisdiction, and in all respects has proceeded in accordance with the law and in a most exemplary manner has vindicated the dignity and authority of his court.

The opinion in this case is not intended, nor must it be construed, as approving what is said in the authorities cited, where they go beyond what is actually necessary for the decision of this case. Whether it is a direct contempt to insult or attack a judge for any of his official acts after the court has adjourned for the term, is a question which, with others of a like character, is not presented and not within the scope of this decision. We pass upon what is now before us; nothing more.

We have not discussed the questions raised below as to the proper method of bringing a decision in *habeas corpus* proceedings into this court for review, whether by direct appeal

or writ of *certiorari,* as all irregularities have been fully waived. *In re Briggs,* 135 N. C., 118. The matter is mentioned in the hope that the law upon this subject may be made clear by legislative enactment, as there seems to be no speedy and at the same time adequate remedy in such a case. In some instances, although they may be rare, it might be proper to allow bail, but this is a matter which addresses itself to the wisdom of the Legislature and does not fall within our province.

There is no error. The petitioner will pay the costs of the proceeding, including the costs of this court.

No Error.