IN RE CHARLES A. BROWN AND G. W. BROWN.

(Filed 17 March, 1915.)

**1. Contempt of Court — Adjournment—Publication—Jurisdiction—Power of Court.**

The judge of the Superior Court ordinarily has the inherent power to hear and determine matters of contempt of his court, both as to direct and constructive contempts, without the intervention of the jury; but in proceedings relating to constructive contempt by publication of false and scurrilous matters relating to the acts, conduct, and habits of the presiding judge, or concerning his official or personal conduct, published after the adjournment of the court, it becomes a matter personal to the judge, and he must seek redress by the ordinary methods and bring his cause before an impartial tribunal.

**2. Same—Statutes—Constitutional Law.**

While a statute is unconstitutional which unduly interferes with the inherent power of the Superior Courts to summarily hear matters in contempt of court and punish the offenders, objection may not be taken to

168—27

Revisal, ch. 17, secs. 939 *et seq.*, on this ground, the provisions being in accordance with the modern doctrine; and having reference to the history of this statute, the context and the language employed, the authority expressly given therein with reference to constructive contempts arising by means of publication, etc., is construed and upheld as written, that the power to punish summarily for defamatory reports and publications, etc., about a matter that is past and ended, no longer exists.

### 3. Contempt of Court—Jurisdiction—Motion to Dismiss.

The refusal of the court to sustain a motion to dismiss the summary proceedings for contempt was proper in this case, it appearing that the newspaper containing the published matter was circulated in the county wherein the court was held at the time in question.

### 4. Reference—Discretion—Contempt of Court.

A motion for a reference under section 875, Revisal, is addressed to the discretion of the Superior Court judge, and exception to the order refusing the reference is without merit.

APPEAL by defendant from *Peebles, J.,* in contempt proceedings, heard on rule to show cause, in NORTHAMPTON, in August, 1914.

Attachment for contempt, heard on rule to show cause.

From the facts in evidence it appeared that shortly after the adjournment of May Term of Wayne Superior Court, the same having been held by *Judge Peebles,* assigned to hold the courts of the Fourth Judicial District, in which said county is situate, the defendants, editors and proprietors of the *Weekly Record,* a newspaper published weekly in the city of Goldsboro, N. C., published an editorial article in said paper severely reflecting on the conduct of Judge Peebles, both as an individual and in reference to his manner and methods as judge in presiding over said court. It appeared also that several copies of the paper had been circulated in the county of Northampton, where Judge Peebles resided and where the hearing was had.

On the return day defendants, having first moved for a reference under section 875 of the Revisal, and to dismiss the proceedings for want of jurisdiction, both of which motions were overruled, answered the rule, disavowing an intent to misrepresent or bring the court into contempt or disrepute; alleged that the article was written in good faith and on information believed to be reliable, etc. An affidavit of Mr. G. A. Norwood was also offered, tending to support some of the charges as written.

There were several affidavits from attorneys practicing in the courts of the county and district and elsewhere, and from others, in support of the rule, and tending to show that Judge Peebles was a humane man, a capable, upright, and learned judge, and that nothing improper or unseemly occurred in the conduct of that or any other court presided over by him.

*In re* BROWN.

The character and contents of the publication can be sufficiently determined by the findings of fact made by the judge at the hearing, and were embodied in the judgment as follows:

"The court finds the following facts:

"1. That the statement published in the *Goldsboro Record* of June 6, 1914, that R. B. Peebles frequently went to sleep on the bench and woke up suddenly and played hell, was false and without foundation in fact.

"2. That the statement in the said issue that R. B. Peebles was so full of whiskey that he went into the solicitor's room for his own room is absolutely false and without foundation in fact; that the said judge had not touched a drop of intoxicating liquor within five and a half hours previous to that time; that it is true that the said judge went to the solicitor's room, which said room was opposite his own room, and lay down to rest at about 6 o'clock in the evening; that said judge went to the solicitor's room for the purpose of resting himself, for the reason that the solicitor had inadvertently locked the door to the judge's room and had kept the key in his pocket, and that at the time when said judge returned to the hotel from the courthouse the solicitor was not present in the hotel, and the said judge went to the solicitor's room to rest purposely, because of the fact that the solicitor had the key to his own room and he could not gain an entrance into his own room until the return of the solicitor with the key to the door thereof.

"3. That the statement that said Judge R. B. Peebles, published in said issue, played setback, or pitch, at night, and while playing said setback or pitch took a drink every ten minutes, and got very drunk, was false and without foundation in fact.

"4. That the publication in said paper, of said issue, that Judge Peebles is unfit to occupy the high and responsible position of judge of the Superior Court of North Carolina, is absolutely false and without foundation in fact.

"5. That the statements contained in an editorial published in said paper of 27 June, 1914, reiterating all of said charges and statements, except the charge that Judge Peebles went to sleep upon the bench and woke up suddenly and played hell, were all false and without foundation in fact.

"6. That each one of the false statements contained in the editorials of the said *Goldsboro Record* of the issue of 6 June, 1914, were made with the intent to defame, degrade, and injure the reputation of said judge, R. B. Peebles.

"7. That all of said charges contained in said issue of said paper on 27 June, 1914, in an editorial, were false, and each charge made in said editorial was made with the intent to defame, degrade, and injure the reputation of said judge, R. B. Peebles.

"8. That the court finds from the facts that said issues of said *Goldsboro Record* of 6 June and 27 June, 1914, containing the said editorials mentioned above, were both circulated and read in Northampton County. I find this fact from inspection of the issues of said paper."

And, upon such findings, the court adjudged respondents to be in contempt, and sentenced them each to pay a fine of $250 and to be imprisoned in the common jail of Northampton County for thirty days.

Defendants excepted and appealed, assigning several errors in the proceedings and judgment.

*W. S. O'B. Robinson & Son, M. H. Allen, W. F. Taylor for appellants. Peebles & Harris, W. H. S. Burgwyn for appellee.*

HOKE, J. At common law, the power of courts of record of general jurisdiction to punish for contempt and, in certain instances, by summary procedure, has existed time out of mind; as said by *Judge Blackstone,* "as far as the annals of the law extend."

It is a power inherent in any court engaged in administering justice as a governmental function, and, in the higher courts, established and existent under constitutional provision and in matters essential to the proper and efficient exercise of their jurisdiction, it may not be destroyed or sensibly impaired by legislative enactment. *Ex Parte McCown,* 139 N. C., 95; *In re Gorham,* 129 N. C., 481, and concurring opinion of *Clark, J.,* 489; *In re Deaton,* 105 N. C., 59; *Scott v. Fishblate,* 117 N. C., 265.

While it is understood with us that, in mere matters of procedure and in courts below the Supreme Court which comes under the influence of a special constitutional provision, the question presented may be to some extent regulated by legislation, it is also held that, both as to direct and constructive contempts, the trial is properly had by the court without the intervention of the jury, and usually by the court against which the offense has been committed. *In re Deaton, supra; Baker v. Cordon,* 86 N. C., 116; *Herndon v. Ins. Co.,* 111 N. C., 384; *Horton v. Green,* 104 N. C., 400.

The power in question is conferred to enable a court to command respect and obedience, and it would go far to weaken and, in case of direct contempt, would well-nigh destroy it if the occasion of its present exercise would have to be referred for decision to some other tribunal or agency.

In reference to this procedure by contempt, it was very generally if not universally recognized as the proper method of maintaining order in the courts and of enforcing obedience to their decrees and mandates, and in case of constructive contempt, often arising from false and de-

famatory publications concerning court trials and proceedings, the power was not infrequently exercised, and this, in earlier times, whether these trials were pending or had terminated. This last position has, however, been very much modified, and owing in a great measure to a different and, to our minds, a truer concept of the nature and extent of this power, and in part, no doubt, to the unusual method of procedure which, in its practical application, usually required that a judge, keenly and at times vitally interested in the result, should consider and determine the questions involved, many of the courts of this country have long held it for law that the right to punish for constructive contempt by reason of false and defamatory publications concerning proceedings in court should be properly confined to such publications about a trial or proceedings still pending; that it was only because and when such publications were calculated to obstruct or unduly interfere with the due administration of justice that such a power could be properly exercised, and that it was only when and to the extent that the judge was presently engaged in dispensing the State's justice that he could be considered as embodying in himself the majesty of the State's law and authorizing him to enforce obedience and respect to the courts and to his official acts; but, after a court had ended and a trial had finally terminated, if false, defamatory, or scurrilous publications were made concerning his official or personal conduct, this became a personal matter, and he must seek redress by the ordinary methods and bring his cause before an impartial tribunal.

In this position, the doctrine of contempt by "scandalizing the court," a term used, I believe, by *Lord Hardwicke,* and without reference to its effect or tendency to obstruct or interfere with the administration of justice, has no place, and the same will be found approved, substantially as stated, in many well considered decisions of the State courts of this country, as, *In re Hart,* 104 Minn., 88; *Story v. The People,* 79 Ill., 45; *Cheadle v. The State,* 110 Ind., 301; *Percival v. The State,* 45 Neb., 741; *Ex Parte Greene,* 46 Tex. Crim. App., 546; *S. v. Anderson,* 40 Iowa, 207, and many others could be cited, is in accord with the rule prevailing in the Federal Court, both by statute and precedent (*Patterson v. Colorado,* 205 U. S., 454; 1 U. S. Comp. Statutes, sec. 725), and, as a practical proposition, obtained in England in 1899 and for a long period prior to that date. *McLeod v. St. Albans,* Appeal Cases 1899, pp. 549-561. In that case *My Lord Morris,* while asserting the existence of the power as described and stated by *Lord Hardwicke,* in delivering the judgment, said further: "Committals for contempt of court are ordinarily in cases where some contempt *ex facie* of the court has been committed, or for comments on cases pending in the courts. However, there can be no doubt that there is a third head of contempt of court by the publication of scandalous matter of the court itself. *Lord Hardwicke* so lays down with-

out doubt in the case of *In re Read and Huggonson.* (1) He says, 'One kind of contempt is scandalizing the court itself.' The power summarily to commit for contempt of court is considered necessary for the proper administration of justice. It is not to be used for the vindication of the judge as a person. He must resort to action for libel or criminal information. Committal for contempt of court is a weapon to be used sparingly, and always with reference to the interests of the administration of justice. Hence, when a trial has taken place and the case is over, the judge or the jury are given over to criticism. It is a summary process, and should be used only from a sense of duty and under the pressure of public necessity, for there can be no landmarks pointing out the boundaries in all cases. Committals for contempt of court by scandalizing the court itself have *become obsolete in this country.* Courts are satisfied to leave to public opinion attacks or comments derogatory or scandalous to them."

True, in the next year, this power was exerted in England in the case of *Reg. v. Gray,* 2 L. R., Q. B. Div., 1900, p. 36, though it may be noted that, in delivering judgment, *Lord Russell* referred to the fact that the article in question, containing scurrilous abuse of the judge and in reference to his conduct as judge while sitting under the Queen's commission, "was published in a newspaper and circulated in the town where he was still holding court."

There are courts in this country, of eminent ability and learning, which still adhere to the earlier position, a notable case being that of *S. ex inf. Crow, Atty.-Gen., v. Shepherd,* 177 Mo., 255, a case very fully commented on in Thomas on Constructive Contempt and *Burdett v. Commonwealth,* 103 Va., 838, and *S. v. Morrill,* 16 Ark., 384; and other decisions are to like purport. And, in North Carolina, this doctrine in reference to constructive contempt was undefined and altogether uncertain until 1870-71, when the Legislature, having its attention called to the subject by the case of *Ex Parte Moore,* then recently decided by the Supreme Court (63 N. C., 397), passed an act (chapter 216, Laws 1870-71) amending our statute on contempt, chapter 177, Laws 1868-69, and which, after reciting that doubts existed as to the extent of the power of the court in the premises, and that it was "due, alike to judicial authority and the freedom of the citizen, that *all* offenses, and especially those for which summary punishments without trial by jury may be imposed by the courts, should be distinctly known and the nature of the punishment defined and prescribed by law," added to section 7 of the former law, "The publication of grossly inaccurate reports of the proceedings of any court," the words, "about any trial or other matter then pending before said court, made with intent to misrepresent or bring into contempt the said court." The amending statute, among other things, then

declared: "That the several acts, neglects, omissions of duty, malfeasances, misfeasances, and nonfeasances specified in the former law as amended were the only acts, etc., that should be the subject of contempt of court, and that, if there were any parts of the common law then in force which recognized any other acts, etc., besides those specified, the same were repealed and annulled."

This statute, appearing in Revisal 1905, ch. 17, sec. 939 *et seq.,* has been several times approved in its principal features by decisions of this Court, beginning with *Ex Parte Schenck,* 65 N. C., 353; *In re Walker,* 82 N. C., 95; *In re Patterson,* 99 N. C., 407, and many other cases. And, so far as we can now see, as construed and interpreted in the cases cited and others, notably *Ex Parte McCown, supra; In re Deaton; Scott v. Fishblate,* it recognizes as valid every power that can rightfully be considered as essential to the respect and dignity of the court and the due and orderly administration of justice therein. The act, in different sections and in comprehensive language, purports to confer on the court the power to punish summarily or on notice any and all disorderly behavior tending to interrupt its proceedings or to impair the respect due to its authority—any such conduct before its referees or juries, while engaged in official duties; any breach of the peace, noise, or other disturbance directly tending to interrupt its proceedings; disobedience of or resistance to its lawful decrees, orders, or processes; contumacious or unlawful refusal of any person to be sworn as a witness or to answer any legal or proper interrogatories after being sworn; misbehavior of any and all subordinate officers of the court in any official transaction; and, in reference to constructive contempts, arising by means of publications, etc.: "The publication of grossly inaccurate reports about any trial, or other matter pending before the court," etc.

Having reference to the history of this statute, the context and the language employed, it was clearly the purpose and meaning of the act to restrict the power of the court, in this last respect, to the publication of grossly inaccurate reports about a trial or other matter still pending, and, this being in our view the proper and only permissible occasion for the exercise of such a power in reference to these publications, we are of opinion that the provision of the statute should, in this respect, be upheld as written, and the power to punish summarily for defamatory reports and criticisms, about a matter that is past and ended, no longer exists.

It may be that if a grossly indecent or scurrilous publication about a judge in reference to his official conduct should be made and circulated in the community where he was presently holding court, and about his rulings in such court, conditions might be created where the exercise of the power could be upheld as essential to the due and orderly administration of public justice (a case presented in *Reg. v. Gray, supra*), but

no such conditions appear in this record, the facts showing that the publications complained of were made after the court had adjourned, and, so far as appears, after any and all matters referred to concerning the official conduct of the judge had terminated. Under the principles stated, therefore, the respondents may not be dealt with by process of contempt, but, however reprehensible their conduct may have been, redress must be sought before another tribunal and by ordinary methods of procedure.

The motion to dismiss for want of jurisdiction was properly overruled. The court finds as a fact that copies of the publication were circulated in the county of Northampton, where the trial was held, and, if it were otherwise, except in cases to enforce obedience to an order or a decree in a suit pending, this, regarded as an independent or collateral matter, is held to be a question of venue. *Herring v. Pugh,* 126 N. C., 852, and, ordinarily, a change of venue is not allowed in proceedings of this character. 9 Cyc., p. 35. And the exception to his Honor's refusal to order a reference, under section 875 of the Revisal, is without merit. Even if the section applied, it clearly leaves the matter in his Honor's discretion.

For the reasons heretofore stated, the judgment of the lower court must be reversed and judgment entered that defendants go without day.

Reversed.