## THOMAS J. HOSMER v. STATE.

No. A-4204.    Opinion Filed Sept. 13, 1923.
(218 Pac. 164.)

(Syllabus.)

1.    **Contempt—Contempt as at Common Law.** The constitutional and statutory definitions of contempt are not all-inclusive. There may be cases of contempt as at common law not included in either definition.

2.    **Contempt—Constitutional Right to Be Heard.** One charged with contempt, either direct or indirect, or at common law, has, by section 25, art. 2, of the Constitution, a right to be heard before punishment is assessed.

3.    **Same.** The constitutional "right to be heard," in a contempt proceeding, means the right of the accused to introduce evidence in a formal, orderly manner in justification or in mitigation of the offense, and to have such evidence considered before judgment in contempt is rendered.

4.    **Former Holding Overruled.** The holding of this court in Ex parte Ballew, 20 Okla. Cr. 105, 201 Pac. 525, to the effect that the constitutional and statutory definitions of contempt exclude every contemptuous act not included in those definitions, is overruled.

Appeal from County Court, Atoka County; J. M. Humphreys, Judge.

Thomas J. Hosmer was adjudged in contempt of court, and he appeals. Reversed.

J. W. Clark and D. H. Linebaugh, for plaintiff in error.

Geo. F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J.  Thomas J. Hosmer, plaintiff in error, was by the county judge of Atoka county, on the 12th day of December, 1921, adjudged to be in direct contempt of court, committed on the 6th day of December, 1921, and his punishment for said contempt was assessed at a fine of $500 and imprisonment in the county jail for a period of six months. From the judgment and order so made, he appeals.

The record discloses that some time prior to the alleged offense there was a civil case pending in the county court, entitled Dameron v. Hosmer, the defendant Hosmer therein being the son of this plaintiff in error. It seems that a judgment for the plaintiff in error's son, Hosmer, had been rendered and entered in the civil case, and that the county judge, after a motion for a new trial had been filed, expressed his conviction, out of court, that the motion should be sustained and the judgment set aside. The plaintiff in error (as he claims, by invitation, though this is denied by the judge) went into the office of J. M. Humphreys, county judge, to discuss this case. In the discussion he remonstrated and criticized the judge's contemplated action of setting aside the verdict rendered. The dispute grew animated and personal, resulting in a personal encounter or assault upon the judge, or by one upon the other—possibly a mutual combat. Whether the plaintiff in error was the agressor or was in any manner justified in taking part in this encounter cannot be definitely ascertained from the record, because the plaintiff in error was refused permission to introduce testimony in support of his special plea showing justification. Upon this question the record discloses that the accusation was in writing and was filed by the county judge a few days after the difficulty, as follows:

"Comes now J. M. Humphreys, county judge of Atoka county, Okla., and gives information that the county court of Atoka county, Okla., is a court of record, and that J. M. Humphreys is judge of said county court, and that said county court is held in the courthouse in Atoka, Okla., and that most of the business is transacted in the office of said county judge in a room adjoining the district court room in said county courthouse, in said county and state; that said county court is continually in session every day of the week except Sunday, and office hours are between 9 a. m. and 5 p. m. of each working day.

"The said court further shows that Thomas J. Hosmer is a resident of Atoka, Okla., and is special officer for the Missouri, Kansas & Texas Railway Company, and that on Tuesday, the 6th day of December, 1921, the said Thomas J. Hosmer committed divers, numerous, and various acts of contempt against the county court and county judge of the Atoka county court in the county judge's office of said county and state, between the hours of 9 a. m. and 12 m. on the said 6th day of December, 1921, during the session of the court and in its immediate view and presence.

"First. The said Thomas J. Hosmer disturbed the peace and quiet and dignity of the said county court and the judge thereof by loud, unusual, and profane language directed towards the judge of said court, and in particular the said Thomas J. Hosmer inquired of the said county judge whether or not the said court had sustained a motion for a new trial in the case of Dameron v. Hosmer, a civil case pending in the county court of Atoka county, and, when the court informed the said Hosmer that the said motion for a new trial had been sustained, the said Hosmer immediately charged the court with having been bribed, and having received money for so holding. The judge of the said court warned the said Hosmer that he was in court, and that such boisterous conduct and language would not be tolerated. Whereupon the respondent, Hosmer, stated he would talk as he pleased, say what he pleased at any time or place, and that he would make the county judge like it. The court quietly informed the respondent that the courtroom and the courthouse was no time or place for such conduct, and asked the respondent to retire. The respondent became enraged, and said, 'Well, by God, you will not try this case or any other one! I am 62 years old, and haven't much longer to live, anyway, and I will see that you don't try this case!' The court again warned the respondent that he was boisterous, and acting contemptuously, and thereupon the defendant replied, 'You have got to dismiss that case' (meaning the case of Dameron v. Hosmer, hereinbefore mentioned). The court informed the respondent, Hosmer, that it was impossible for him to dismiss the case, whereupon the respondent, Hosmer,

said, 'Well, by God, I will make you dismiss it!' And thereupon said Hosmer drew from his holster a large-sized caliber pistol, either a .38 or a .44, and proceeded to try to kill the said J. H. Humphreys, county judge, and, after a struggle with the assistance of the assistant county attorney, J. N. Maxey, and Jack Bonham, deputy sheriff, and others, the respondent was disarmed.

"The court further gives this information: That during the attempt to subdue and disarm the respondent the respondent struck the said J. M. Humphreys, county judge of Atoka county, over the head with said pistol, which is of the weight of several pounds, and inflicted several scalp wounds upon the person of the said J. M. Humphreys, judge of the county court of Atoka county, Okla., causing considerable inconvenience, illness, and ignominy to fall upon the judge, and contempt upon the authority of the county court of Atoka county, Okla.

"It is therefore by the county court of Atoka county, Okla., ordered that a warrant of arrest be issued by the court clerk of Atoka county, Okla., for the arrest of the said Thomas J. Hosmer, and that his body be produced in the Atoka county court, in the district courtroom thereof, at 10 o'clock a. m. on the 12th day of December, 1921, then and there to be and remain and to answer the charges of this court, and until he is purged of said contempt.

"J. M. Humphreys, County Judge."

Upon this accusation a warrant was issued, upon which the accused was arrested and brought into court, where he was represented by counsel, and filed a demurrer to the accusation on two grounds: First, that the accusation did not state facts constituting either a direct or an indirect contempt of court; and, second, that the accusation was not presented by any officer authorized by law to present, file, and prosecute the accusation made. The demurrer was overruled. Accused then demanded a trial by jury, which was refused. The accused then offered to file a lengthy response, showing that the accused was not guilty as charged.

A condensed statement of facts contained in the response was a specific denial of every allegation contained in the accusation; that at about 11 o'clock of the day of the difficulty the accused, while upon the streets of Atoka, was approached by Victor Dorrell, a nephew of the county judge, who stated to the accused that Judge Humphreys desired to see him in his office at the courthouse; that, in response to the request so made, the accused went into the judge's office with Victor Dorrell; that he there found Judge Humphreys engaged in reading a newspaper; that before that there had been a civil action brought by A. L. Dameron again Ernest Hosmer, a son of the accused, wherein the plaintiff sought to recover damages for an injury claimed to have been sustained to his property by reason of an automobile collision; that at the trial of this cause before a jury in the county court a verdict for the defendant had been rendered and entered; that the plaintiff thereafter filed a motion for a new trial, which had been argued, but not decided, the same having been taken under advisement by the court; that, after being seated in the office of the county judge, Judge Humphreys stated to the accused that, after consideration of the motion for a new trial, he had decided that it should be sustained, because in his opinion the jury failed to follow the weight of the evidence in the rendition of their verdict; that the accused stated that he regretted this contemplated action by the court, stating that it would cause his son additional trouble, and the expense of a new trial, and that he believed that the verdict in the first trial should not be disturbed; that thereupon the judge, in substance, stated to the accused that, if he would pay him (Judge Humphreys) the sum of $100, he would arrange it so as to avoid another trial; that the accused thereupon stated that he would not permit his son to be held up in any such way; that the judge then stated that there were

numerous boys and girls in and about Atoka that were driving automobiles around on their way to hell, and that the accused had another child who was going in that direction; that the accused warned the judge to make no further insinuations against members of his family, and started to leave the room; that thereupon the judge grabbed the accused from behind, about his arms, and hissed a bulldog owned by the judge at the accused; that while accused was being so held by the judge the dog attacked and bit the accused; that the judge was very angry, and called to his nephew to raise the window so that the accused might be thrown out, and called to the nephew to disarm the accused; that the accused was a special officer of the Missouri, Kansas & Texas Railway Company, charged with the duty of guarding and protecting the property of the company, and was authorized by law and the sheriff of Atoka county to go armed; that Dorrell got hold of the accused's pistol, which was in a scabbard at his side, but that accused jerked the pistol from Dorrell, and called upon the judge to turn him loose, and call off the dog, or he would strike him (Judge Humphreys); that the judge declined to do either, and that the accused did strike at the judge over his shoulder while his arms were partially pinioned, and that, based upon information, he believed that the pistol struck the judge's head, and probably caused an abrasion; that the judge then directed Dorrell to call for help; that thereupon a deputy sheriff entered, and accused surrendered his pistol to this deputy; that no other attempt was made to use the pistol in an offensive or a defensive manner; that the accused acted purely in his necessary self-defense, to protect himself against the assault made upon him by the judge, his nephew Dorrell, and the bulldog owned by the judge.

The request to file this response or plea was denied, on the ground that the offense charged was a direct contempt,

and that proof controverting the facts known to the trial judge would not be permitted. After denying the accused the right to file this response the court said:

"The statements made will be considered as the answer by the defense to the charge and his effort to purge himself."

Whereupon the accused made a verbal plea of not guilty, and asked permission to introduce evidence to show that fact by several witnesses there present. This request to offer proof was likewise denied. The offer was then repeated in different forms, and in each instance denied. Finally, after prolonging argument, the court said:

"Has the defendant anything to offer or to say to purge him of the contempt of court of which you (are) adjudged?"

Counsel for accused answered:

"Nothing further than what has been said."

The court then addressed the accused, rehearsing the controversy in detail, and at length concluding as follows:

"It is sentence of the court that the defendant pay a fine of $500 and six months in the county jail, and, upon a failure to pay said fine and costs, it will be served out at $1 each day until fine and cost is paid."

Afterwards a motion for a rehearing was argued and denied, and a motion for a new trial was overruled, and the case now comes here on appeal.

Plaintiff in error claims that if his conduct could be deemed to be contemptuous, it was an indirect contempt, upon which issue he was entitled to a trial to jury. In the course of the proceedings a jury was demanded, which was by the court refused. This difficulty took place in the private office of the county judge, during an intermission in

the term, at a time when the court was not engaged in the trial of civil cases, and in the absence of the other officers of the court, no other person excepting Dorrell having been present at the time the difficulty commenced. While the disturbance was in progress others from nearby offices came in and prevented further hostilities. The questions involved are whether or not this conduct on the part of the plaintiff in error constituted a contempt of court, either under the common law or under the Constitution and statute laws of this state, and, if so, whether it was a direct or an indirect contempt, as defined by law, and whether the accused was deprived of a right to be heard and make a defense within the meaning and terms of our Constitution. The law of contempt arises out of necessity. The power to enforce decorum in the courts and obedience to their orders and just measures is so essential that it would be difficult to carry on court procedure in an efficient and orderly manner without the power to punish those who disobey such orders, or who are guilty of conduct calculated to bring the authority and administration of law into disrespect, or to interfere with its orderly processes.

Contempts, according to the common law and under our Constitution and statutes, are classified as direct and indirect. Our Constitution, in either case, gives the accused the right to a hearing.

The statute (section 1697, infra) defining indirect contempt is broader and more comprehensive than the definition given in the Constitution, and the statute provides that, in all cases of indirect contempt, whether as defined by the Constitution or as defined by statute, the accused shall have a right to a trial by jury.

Section 1699, Comp Stat. 1921, provides:

"In all cases of indirect contempt the party charged with contempt shall be notified in writing of the accusation and have a reasonable time for defense; and the party so charged shall, upon demand, have a trial by jury."

Section 25, art. 2, of the Constitution is as follows:

"The Legislature shall pass laws defining contempts and regulating the proceedings and punishment in matters of contempt; Provided, that any person accused of violating or disobeying, when not in the presence or hearing of the court, or judge sitting as such, any order of injunction, or restraint, made or entered by any court or judge of the state shall, before penalty or punishment is imposed, be entitled to a trial by jury as to the guilt or innocence of the accused. In no case shall a penalty or punishment be imposed for contempt, until an opportunity to be heard is given."

Direct and indirect contempts are defined by statute (section 1697, Comp. Stat. 1921):

"Contempts of court shall be divided into direct and indirect contempts. Direct contempts shall consist of disorderly or insolent behavior committed during the session of the court and in its immediate view and presence, and of the unlawful and willful refusal of any person to be sworn as a witness, and the refusal to answer any legal or proper question; and any breach of the peace, noise or disturbance so near to it as to interrupt its proceedings, shall be deemed direct contempt of court, and may be summarily punished as hereinafter provided for. Indirect contempts of court shall consist of willful disobedience of any process or order lawfully issued or made by court; resistance willfully offered by any person to the execution of a lawful order or process of a court."

This and the two succeeding sections of the statutes were originally enacted by the territorial Legislature before statehood; and in Smythe v. Smythe, 28 Okla. 266, 114 Pac. 257, it was held that the powers granted the territorial Legislature

by the Organic Act creating the territory did not include the power to modify the common law governing contempts of court, following Smith v. Speed, 11 Okla. 95, 66 Pac. 511, 55 L. R. A. 402. These sections of the territorial statutes were, however, carried over and incorporated in the Harris-Day Code, and became effective May 16, 1913, thus becoming the statutory law of this state, in compliance with our constitutional provision that ''The Legislature shall pass laws defining contempts and regulating the proceedings and punishment in matters of contempt.''

Contempt at common law has been variously defined. In 13 C. J. 4, it is defined thus:

''A contempt of court is disobedience to the court, by acting in opposition to the authority, justice and dignity thereof. A direct contempt is an open insult committed in the presence of the court to the person of the presiding judge, or a resistance or defiance in his presence to its powers or authority, or improper conduct so near to the court as to interrupt its proceedings. A constructive contempt is an act done, not in the presence of the court, but at a distance, which tends to belittle, to degrade, or to obstruct, interrupt, prevent, or embarrass the administration of justice.''

In 6 R. C. L. 488, it is defined in this language:

''A direct contempt being such as is offered in the presence of the court while sitting judicially; and an indirect, or, as it is sometimes called, a constructive contempt being such as tends by its operation, though not committed in court, to obstruct and embarrass or prevent the due administration of justice.''

Blackstone says contempt of court may be committed by speaking or writing (or acting) contemptuously of the court or judges acting in their judicial capacity. Numerous definitions of like general import, as well as more specific defini-

tions applicable to the facts here, may be found in decisions quoted in Ex parte McCown, 139 N. C. 95, 51 S. E. 957, 2 L. R. A. (N. S.) 603.

Now it will be seen that we may have a case here not falling within the purview of the definitions of either direct contempt or indirect contempt, as found in our Constitution and statutes, but which does fall within the definitions as established at common law. The contemptuous conduct here charged was not "disorderly or insolent behavior committed during the session of the court and in its immediate view or presence," nor, "any breach, of the peace, or noise or disturbance so near to it as to interrupt its proceedings," the statutory definitions of direct contempts; nor was it an indirect contempt, as defined by our statute as being "a willful disobedience of any process or order lawfully issued or made by the court." There are many instances of contempt at common law, perpetrated in or out of court, that do not come within either of these statutory definitions; for instance, intimidating witnesses or conveying them into another jurisdiction, the illegal influencing or bribing of witnesses or jurors, threats and intimidation against judges and officers of the court, falsification of records, etc. If the offense in this case, then, is not contempt within the terms of the statutes, but falls within the definitions established at common law, it may be punished as such, subject to the provisions of our Constitution and statutes not in conflict with it. The concluding sentence of our constitutional declaration on contempts is: "In no case shall a penalty or punishment be imposed for contempt until an opportunity to be heard is given." This, we think, includes all contempts at common law.

It has been found by numerous authorities that an assault upon a judge, growing out of or connected with any un-

finished judicial matter, perpetrated at or in the vicinity of the place of holding court, while the matter in dispute is still pending, constitutes a direct contempt of court. A well-considered case of this character is Ex parte McCown, supra, a case ably and exhaustively analyzed, quoting from many authorities giving their reasons and deductions, all to the effect that one who assaults a judge under such circumstances is guilty of direct contempt, for which he may, in the absence of constitutional limitations, be punished summarily. A line of more recent decisions is to the same effect. See Weldon v. State, 150 Ark. 407, 234 S. W. 466, 18 A. L. R. 202, in which the following syllabus appears:

"An assault upon the judge during an intermission of the court, at a place other than that where the court is held, because of his official conduct with respect to a case on trial before him, is a contempt which the court has inherent power to punish."

See, also, In re Fountain, 182 N. C. 49, 108 S. E. 324, 18 A. L. R. 208, pp. 213, 214, with annotations on assaults committed out of court.

We have found but two decisions that to some degree might indicate that the offense here charged was not a direct contempt. In Snyder v. State, 151 Ind. 553, 52 N. E. 152, the court held:

"Where attorneys during a court day, but while it was not in session, held a meeting, at which one of their number presided, in a room in the courthouse adjoining the court-room, and occasionally used as a courtroom, which meeting was attended by the judge, at their request, their acts in his presence are not committed in the presence of the court, and hence cannot constitute direct contempt."

And in State v. Root, 5 N. D. 487, 67 N. W. 590, 57 Am. St. Rep. 568, it was held that a practicing attorney who in

the streets and in stores, not in the presence nor hearing of the court, uses abusive and defamatory language against the judge is not guilty of contempt of court. Held, further, that an affidavit charging a direct criminal contempt will be tested by the rules of criminal pleading applicable to indictments and informations.

After a painstaking consideration of the authorities above cited we have come to the conclusion that the facts in this case, as stated in the written accusation, did not constitute either a direct or an indirect contempt, as defined by our statutes, but that it did state a direct contempt at common law, and that the common law and procedure governs, in so far as not superseded or modified by the Constitution or by statutory enactments authorized by the Constitution.

The holding of this court in Ex parte Ballew, 20 Okla. Cr. 105, 201 Pac. 525, that the rule of statutory construction, "Expressio unius est exclusio alterius," applies to statutory regulations governing contempts, is overruled. We hold that, if the assault in the Ballew Case grew out of a pending injunction, it amounted to a direct contempt, punishable as at common law, subject to the modification in our Constitution; if it grew out of personal matters not connected with pending or past litigation, it was not a contempt of court, either direct or indirect. From the record in the Ballew Case it was impossible to ascertain definitely the exact cause or purpose of the assault made upon the judge.

Our Constitution provides that, in all cases of contempt, the accused shall be accorded a hearing. A "hearing" is defined by Bouvier, 1429, as:

"The examination of a prisoner charged with a crime or misdemeanor and of the witnesses for the accused."

A "hearing" before a United States Commissioner is defined as:

"An examination of a prisoner and of the witnesses for the prosecution and the defense."

See Words and Phrases, First Series, vol. 4, p. 3238.

In legal parlance the word "hearing" usually denotes an investigation by the introduction of proof or the testimony of witnesses. Words and Phrases, Second Series, vol. 2, p. 832.

The right to a hearing is well stated in an opinion by Judge Doyle in Ex parte Sullivan, 10 Okla. Cr. 465, 138 Pac. 815, Ann. Cas. 1916A, 719, which should, for a better comprehension of the points involved, be carefully read and considered. The logic and the conclusions reached in the Sullivan Case are unanswerable to the effect that the constitutional right to be heard in a matter of contempt means the right to introduce, in a formal, orderly manner, evidence in justification or in mitigation of the charge, and to have a record made of such proof, as in other cases.

It is clear, then, that, in a contempt proceeding, the right of the accused to a "hearing," within the meaning of the term as used in our Constitution, is more than the right to make a mere verbal explanation, or to listen to a speech from the bench by an interested judge denouncing the conduct of the accused. It includes the right to introduce evidence and have that evidence considered. The denial of that right to the accused in this case, in support of his plea of not guilty, was error. The record indicates that the accused was not accorded a "hearing" as is contemplated by our Constitution.

The Attorney General's confession of error is sustained, and the cause is reversed.

MATSON, P. J., and DOYLE, J., concur.