**A. H. LAYMAN, Thomas Clinton Layman, and Andrew H. Layman, Petitioners,**

v.

**Hon. Leslie WEBB, District Judge of Tulsa County, Oklahoma, Respondent.**

No. A–12866.

Court of Criminal Appeals of Oklahoma.

Feb. 24, 1960.

J. A. Rinehart, El Reno, R. L. Davidson, Jr., James G. Davidson, Tulsa, for petitioners.

Robert D. Simms, County Atty., Thomas D. Gresham, Asst. County Atty., John M. Imel, Asst. County Atty., Tulsa County, Tulsa, for respondent.

POWELL, Presiding Judge.

This is an original proceeding wherein A. H. Layman, Thomas Clinton Layman, and Andrew H. Layman seek a writ of prohibition directed to Hon. Leslie Webb, District Judge, Tulsa County, commanding him to desist and refrain from further actions against defendants who refused to answer certain questions and to produce certain records at instance of a grand jury of Tulsa County, on the ground that to do so might incriminate them.

On the filing of the petition in this Court on February 2, 1960, we issued an alternative writ of prohibition and directed the district court of Tulsa County and Hon. Leslie Webb, Judge thereof, to desist and refrain from further action against the petitioners until the further order of the Court and to show cause on the 5th day of February, 1960, at 10:00 a. m. why he should not be permanently restrained, etc. The grand jury has been recessed pending the outcome of the within proceedings.

A hearing was duly had in this Court, the case advanced for disposition, but· the parties granted permission to file additional authorities.

From the petition and exhibits it appears that the grand jury in question was convened to investigate all public offenses against the State of Oklahoma, committed and triable in Tulsa County, but the newspaper accounts, as set out in petitioner's Exhibit A, stated that the grand jury was investigating the construction of a State Highway service road, the cement work on which is said to have been contracted to petitioners. The grand jury was shown inspecting the road. The newspaper articles from day to day stated that Layman & Sons bid $75 per cubic yard, which was accepted, whereas the prevailing price was $33 per cubic yard, the inference being that there was law violation somewhere.

The verified petition and evidence before us shows that each of the petitioners was on January 14, 1960, subpoenaed to appear before the grand jury and produce records of Layman & Sons, contractors, from January 1, 1954 to January 1, 1959, covering a period of five years; that Layman & Sons is a partnership composed of the petitioners; that the petitioners in obedience to the subpoenas appeared before the grand jury, were sworn, stated their names and identified themselves, but thereupon claimed the asserted Constitutional privilege to remain silent and declined to either testify or produce records which they stated might later be used against them, or to say or do anything which would be self-incriminating. That said witnesses were thereupon

ordered and directed to report the following day, January 15, 1960, at 1:30 p. m., and again directed to bring the aforesaid records, and that they did each again personally appear, and were thereupon interrogated at length, some of which questions petitioners are accused of not answering being set forth in "true bills"[1] or charges made by the grand jury to the district court of Tulsa County, Judge Leslie Webb, Presiding Judge, and filed in that court on January 25, 1960, in which it was charged that petitioners were in indirect contempt of court.

Thereupon the court issued a body attachment or bench warrant for each of the said petitioners, and the petitioner Thomas Clinton Layman was summarily arrested and brought before the court and admitted to bail, and each of the petitioners were ordered, and directed by the court to appear before Hon. Leslie Webb, District Judge, the following day, January 26, 1960, at 1:30 p. m.

It appears that at the time and place specified the petitioners appeared with counsel and demanded a jury trial, etc. That in open court the judge stated that he had not made up his mind whether the contempt, if any, alleged in the accusations was direct or indirect, and that no plea was necessary, or would be accepted until he had determined that question and that he thereupon recalled the bench warrants as to Andrew H. Layman and A. H. Layman, and each of the defendants was ordered to appear in open court on February 3, 1960 at 1:30 p. m. to show cause why they should not each be found in contempt of court. They were remanded to the custody of the sheriff in lieu of $500 bonds. The bonds were posted, and on February 2, 1960 there followed the alternative writ of prohibition issued by this Court, as stated.

It was the argument of counsel that Judge Webb had indicated that he would hold petitioners in contempt of court and would require them to produce their personal records of the partnership. The judge at hearing before this court stated that he proposed to have a hearing and determine whether or not the petitioners had wrongfully refused to produce the

1. The questions asked Thomas Clinton Layman are typical:
   a. Where do you live?
   b. Were you sworn as a witness before this grand jury?
   c. Do you know if Layman & Sons, Contractors, is a corporation or a partnership, or is individually owned?
   d. Are you a partner in Layman & Sons, Contractors, or do you hold any financial interest in Layman & Sons, Contractors?
   e. Did Layman & Sons, Contractors, purvey any goods, wares or merchandise of any sort to the State of Oklahoma or Tulsa County for which Layman & Sons, Contractors, received public money during a period from January 1, 1954 to January 1, 1959?
   f. Do you at this time, have in your possession or under your supervision or control any cancelled checks, check book stubs, check books, bank statements and deposit slips made or issued on behalf of, and in the course of business of Layman & Sons, Contractors, from January 1, 1954 to January 1, 1959?
   g. Were you directed by the Foreman of the Grand Jury on January 14, 1960, to return before the Grand Jury at 1:30 p. m., January 15, 1960, and bring with you all cancelled checks, check book stubs, check books, bank statements and deposit slips made and issued on behalf of, and in the course of business of Layman & Sons, Contractors, from January 1, 1954 to January 1, 1959, which are in your possession or under your supervision or control?
   h. Did you refuse to bring all cancelled checks, check book stubs, check books, bank statements and deposit slips made or issued on behalf of, and in the course of business of Layman & Sons, Contractors, from January 1, 1954 to January 1, 1959, which are in your possession or under your supervision and control pursuant to a subpoena duces tecum issued by the Grand Jury requiring that you bring with you the above described records?
   i. Do you refuse at this time to furnish the Grand Jury now convened in Tulsa County the above described records for inspection by the Grand Jury?
   j. With what banks does Layman & Sons, Contractors, have its or their checking account?

records requested and answer the questions propounded. There was confusion indicated as to procedure, but the judge stated that the bonds would be immediately cancelled, and Judge Webb stated that he had not held petitioners in contempt and that a further hearing would be necessary prior to his ruling, and that he had not meant to indicate what his ruling would be.

Thereupon the matters under the facts indicated, were submitted to this Court.

It is first urged by petitioners that the act of refusal to testify before a grand jury is not enumerated in the statute on contempt; that in order for the act to constitute contempt, it must be specifically enumerated in the contempt statutes and cannot be included by inference; that if the legislature had wanted to make it contempt, either direct or indirect, to refuse to answer questions propounded by an inquisitorial body, they would have so stated.

It is true that our statute, 21 O.S.1951 § 565, defining contempt, does not directly mention grand juries. It reads:

"Contempts of court shall be divided into direct and indirect contempts. Direct contempts shall consist of disorderly or insolent behavior committed during the session of the court and in its immediate view, and presence, and of the unlawful and *wilful refusal of any person to be sworn as a witness, and the refusal to answer any legal or proper question;* and any breach of the peace, noise or disturbance, so near to it as to interrupt its proceedings, shall be deemed direct contempt of court, and may be summarily punished as hereinafter provided for. Indirect contempts of court shall consist of wilful disobedi- . ence of any process or order lawfully issued or made by court; resistance wilfully offered by any person to the execution of a lawful order or process of a court." (Emphasis supplied.)

For a solution of the question posed, the pertinent and related constitutional provisions must also be considered.

Section 21 of the Bill of Rights of the Constitution of Oklahoma, among other things provides:

"No person shall be compelled to give evidence which will tend to incriminate him, except as in this Constitution specifically provided, * * *."

We also hereinafter quote Sections 27, 18, and 25 of the Bill of Rights:

"§ 27. Any person having knowledge or possession of facts that tend to establish the guilt of any other person or corporation charged with an offense against the laws of the State, shall not be excused from giving testimony or producing evidence, when legally called upon so to do, on the ground that it may tend to incriminate him under the laws of the State; but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may so testify or produce evidence." [2]

"§ 18. A grand jury shall be composed of twelve men, any nine of whom concurring may find an indictment or true bill. A grand jury shall be convened upon the order of a judge of a court having the power to try and determine felonies, upon his own motion; or such grand jury shall be ordered by such judge upon the filing of a petition therefor signed by one hundred resident taxpayers of the county; when so assembled such grand jury shall have power to investigate and return indictments for all character and grades of crime, and such other

2. This section of the Constitution has not to date been implemented by any statute applicable to testimony before a grand jury. And even so, such a statute would have to provide for exemption of the witness from prosecution, and of course, in a matter where the court had jurisdiction. Ex parte Gudenoge, 2 Okl.Cr. 110, 100 P. 39.

powers as the Legislature may prescribe; Provided, that the Legislature may make the calling of a grand jury compulsory." As amended State Question No. 354, Referendum Petition No. 101. Adopted primary election July 1, 1952.

"§ 25. The legislature shall pass laws defining contempts and regulating the proceedings and punishment in matters of contempt: Provided, that any person accused of violating or disobeying, when not in the presence or hearing of the court, or judge sitting as such, any order of injunction, or restraint, made or entered by any court or judge of the State shall, before penalty or punishment is imposed, be entitled to a trial by jury as to the guilt or innocence of the accused. In no case shall a penalty or punishment be imposed for contempt, until an opportunity to be heard is given."

The above provisions were considered by this Court in the early case of Scribner v. State, 9 Okl.Cr. 465, 132 P. 933, in a lengthy opinion of 44 pages by Judge Furman, which may be referred to, and among other conclusions reached, in the body of the opinion, (9 Okl.Cr. at page 475, 132 P. at page 937) it was said:

"It is true that a grand jury has no power to compel a witness to answer questions, but it may refer the question asked to the court, who will decide as to whether or not the witness must answer any given question, and who alone has power to compel obedience."

■ It follows that when the court is advised by the grand jury of the questions asked and refused that it would advise the witness as to whether in its opinion the questions were proper and as to the duty of witness to answer. If the witness persisted in refusal to answer and could give no valid reason for refusal, the contempt then would be in the presence of the Court and would be direct. It is therefore not necessary to pass on the argument of counsel that in this case the questioning of petitioners was out of the presence of the court and that failure to answer questions could constitute neither direct nor indirect contempt.[3] For while it is true that initially the questioning was necessarily out of the presence of the court, it was the duty of the jury, as we have seen, to report the matter to the Court. And here the report was by "true bills" or written accusations. As said in O'Connell v. United States, 2 Cir., 40 F.2d 201–203:

"Either a written presentment by the grand jury, as in Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979, or an oral presentment, as in Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann. Cas.1912D, 558, will suffice to bring the alleged contempt before the court."

That was the first step; a report. No form had been prescribed. The second step was to have taken place on February 3, 1960, but, as we have seen, our alternative writ of prohibition prevented this hearing. Until the trial court has a hearing and gives the petitioners opportunity to show whether questions apparently innocuous, in fact may form the basis of a charge, and to produce evidence, if they so wish, in support of the contentions, this court is not in position to pass on the matter of the specific questions,[4] with the ex-

3. In some jurisdictions proceedings before a grand jury are regarded as proceedings in court and contempts occurring in the presence of a grand jury are treated as taking place in the presence of the court or so near thereto as to obstruct justice. See Camarota v. United States, 3 Cir., 111 F.2d 243, certiorari denied 311 U.S. 651, 61 S.Ct. 16, 85 L.Ed. 416; 38 C.J.S. Grand Juries § 41, p. 1056; Gendron v. Burnham, 146 Me. 387, 82 A. 2d 773, 38 A.L.R.2d 210; People v. Sheridan, 349 Ill. 202, 181 N.E. 617; People v. Cochrane, 307 Ill. 126, 138 N.E. 291. But see a case from this Court: Blanton v. State, 31 Okl.Cr. 419, 239 P. 698.

4. See Ex parte Sullivan, 10 Okl.Cr. 465, 138 P. 815, wherein Sullivan was charged with direct contempt of the Supreme Court, but when brought before a Special

ception of the questions as to records, cancelled checks, bank statements and deposit slips for the five year period from January 1, 1954 to January 1, 1959. We shall say more about this hereinafter.

The case of Blanton v. State, 31 Okl. Cr. 419, 239 P. 698, has been called to our attention. This case is inapplicable for a number of reasons. Suffice to say, here the procedure as to questioning of petitioners before the court, has not yet been completed, and unless the petitioners are riotous or abusive before the grand jury, any claim of contempt where the proper procedure is followed, would, as we have indicated, be direct contempt: no formal complaint would be necessary, and the contemnors would not be entitled to a jury trial as in indirect contempt.

The effect of the conclusion reached is to deny the enjoining of district Judge Webb from further proceedings before the original grand jury or another that might be called if for any reason it be impracticable to recall intact the original grand jury.

█ To eliminate any procedural questions here and to provide a guide for the future we have searched for and found in a case cited by petitioners, as well as by the State, what we think is a set of rules that fit in perfectly and are compatible with our constitutional and statutory provisions as interpreted in our Scribner, Sullivan, and Hosmer cases, supra. See In re Hitson, D.C.Cal.1959, 177 F.Supp. 834, 837. We adopt such rules:

Procedure

"I. The witness must be called before a legally constituted Grand Jury and placed under oath.

"II. A pertinent question must be propounded to the witness by the prosecuting official or a member of the Grand Jury.

"III. The witness must refuse to answer the question on the ground that an answer would tend to incriminate the witness under some State law.

"IV. The Grand Jury, the prosecuting official and the witness (with his attorney, if he has one) shall come before the Court in open session.

"V. The Foreman of the Grand Jury (or the prosecuting official) must inform the court of the matters set forth in paragraphs I through III above, and ask the advice and assistance of the Court in connection with the privilege claimed.

"VI. The Court hears the question which the witness has refused to answer.

"VII. The Court makes certain that the witness understands the question that has been put to him. (If the witness does not understand the question, it must be reframed so that there is no doubt that he does understand it.)

"VIII. The Court then proceeds to consider the bare question, which the witness has refused to answer, and determines whether or not, from the face of the question, an answer could, in fact, tend to incriminate the witness under any State law.

"IX. If the question does not, on its face, disclose that an answer would tend to

Supreme Court, and having admitted filing a certain scandalous exhibit in a case pending in that court, the presiding judge without further hearing summarily adjudged Sullivan in direct contempt of court, and ordered him to jail. This court found that section 25 of our Bill of Rights to be different from that of the constitution of sister states at the time and it was held that the last clause specifically prohibits any court from imposing punishment of any character upon any contemptuous offender, either direct or indirect, until he has been given an op-

portunity to be heard. See also Hosmer v. State, 24 Okl.Cr. 312, 218 P. 164, 168, where in the concluding paragraph of the opinion it is said: "It is clear, then, that, in a contempt proceeding, the right of the accused to a 'hearing,' within the meaning of the term as used in our Constitution, is more than the right to make a mere verbal explanation, or to listen to a speech from the bench by an interested judge denouncing the conduct' of the accused. It includes the right to introduce evidence and have that evidence considered."

**332**

incriminate, the witness is then given an opportunity to be heard and, if it is desired, to introduce any relevant evidence which substantiates the claim that from the implications of the question, in the setting in which it is asked, there is a real and appreciable danger that the answer would be dangerous because an injurious disclosure might result from it (In re Portell, 7 Cir., 245 F.2d 183; Hooley v. United States, 1 Cir., 209 F.2d 234, and Alexander v. United States, 9 Cir., 181 F.2d 480).

"X.  If, after a consideration of the question in the light of the evidence adduced, any other relevant facts, and the applicable law, the court is satisfied that an answer would not tend to incriminate the witness under any State law, the court then rules that the privilege may not be validly claimed and directs the witness to return to the Grand Jury room and answer the question.

"XI.  Should the witness continue to refuse to answer the question, this fact is reported to the court in open session with the Grand Jury, the prosecuting official and the witness (with his attorney, if he has one) present.

"XII.  The court again hears the question as in step VI, supra.

"XIII.  The Court then, in the presence of, and on behalf of the Grand Jury, puts the question to the witness and inquires:

"A.  If the witness understands the question;

"B.  If the witness understands that the court has ruled that the privilege against self-incrimination may not be validly claimed for that question, and the court has ordered him to answer it.

"C.  If the witness has given all the reasons that he has for his refusal to answer the question; and

"D.  If the witness still refuses to answer the question as directed by the Court.

"XIV.  If the witness affirmatively answers each of the four questions set forth in paragraph XIII, supra, the witness has committed a contempt in the presence of the court.  The Court may then certify it saw and heard the conduct constituting such contempt, and may proceed to punish the witness summarily in accordance with 21 O.S.1951 § 566."

▪ The rules evolved in the Hitson case, (177 F.Supp. 834) and here adopted, are buttressed in that opinion not only by persuasive reasoning but a long line of State and Federal cases supporting the law on which the rules are based.  And while the Fifth Amendment to the Constitution of the United States applies strictly to the Federal Government, Oklahoma has in its Constitution a provision similar and being Section 21 of the Bill of Rights of the Oklahoma Constitution, Art. II.  And while it is true that under the circumstances this Court would not be bound by the Federal interpretation,[5] the reasoning in the supporting cases there cited, compels adherence.  Paragraphs 3 to 7 and 9 to 11 inclusive of the syllabus to the Hitson case read:

"3.  Under the Fifth Amendment, the rule for federal courts must be that no person shall at any time be compelled to answer any question or say anything, which might be the confession of the commission of a public offense, or which might be used against him in an attempt to convict him of a public offense.  U.S.C.A.Const. Amend. 5.

"4.  Determination of whether an answer to a specific question put to person called as witness before grand jury will in fact tend to incriminate that person must be made by the court and not by the witness.  U.S.C.A. Const. Amend. 5.[6]  (See exposition following within quotations).

---

5.  The first ten amendments to the United States Constitution were limitations on the Federal Government, and do not apply to states.  Maxwell v. Dow, 176 U.S. 581, 20 S.Ct. 448, 451, 44 L.Ed. 597.

6.  On this point see opinion by Bratton, J., in Enrichi v. United States, 10 Cir., 1954, 212 F.2d 702, 703; Note in 38 A.L.R.2d at page 248, § 7; 58 Am.Jur. 70, 71, Witnesses, and §§ 81 and 82; Judge

"5. In determining whether witness may properly refuse to answer question before grand jury on ground that it may tend to incriminate her it is enough that court be shown by argument how conceivably a prosecutor, building on seemingly harmless answer, might proceed step by step to link witness with some crime against United States and that this suggested course and scheme of linkage does not seem incredible in circumstances of particular case. U.S.C.A.Const. Amend. 5.

"6. Privilege against self-incrimination may be validly claimed where an answer will, or might, become a link in the chain of evidence. U.S.C.A. Const. Amend. 5.

"7. In order for person to be entitled to claim privilege against self-incrimination, there must be more than a bare possibility, something more than a remote and naked possibility that answer will or might be a link in the chain of evidence, and simple logic and sound reason require that there must be at least a real and appreciable probability that in ordinary operation of law and in ordinary course of things answer might incriminate, or tend to incriminate. U.S.C.A.Const. Amend. 5 * * *

"9. Privilege against self-incrimination is not limited to an answer which would directly incriminate witness and is not limited to proceeding then being conducted. U.S.C.A.Const. Amend. 5.

"10. Witness to satisfy burden of proving that answer to question might tend to incriminate him is not required to demonstrate conclusively that answer to question would surely subject him to prosecution, or need he demonstrate that answer to question is likely to result in his being convicted of some crime, and likewise he is not required to disclose exact hazard feared, but to sustain privilege witness need only make it evident from question and its implications considered in setting in which it is asked, that answer, or even an explanation as to why it cannot be answered might be dangerous because an injurious disclosure might result. U.S.C.A.Const. Amend. 5.

"11. Privilege granted witness in order to protect himself against self-incrimination must be accorded a liberal construction in favor of right it is intended to secure. U.S.C.A.Const. Amend. 5." [177 F.Supp. 835.]

Of course the Hitson case must be read in its entirety for a thorough understanding and appreciation of the reasons supporting the rules of law set out in the syllabus.

Expanding on paragraph 5 of the quoted syllabus, we have read authority after authority and based thereon, we feel that we should say more for the guidance of the trial courts. It is the opinion of this court that the determination of whether an an-

Learned Hand in United States v. Weisman, 2 Cir., 111 F.2d 260.

Also in line with the reasoning in the Hitson case, see case from the Supreme Court of Washington, In re Stewart, 1922, 121 Wash. 429, 209 P. 849, 852, where the court quotes from the basic case on the subject and being the statement of Chief Justice Marshall in United States v. Burr, 25 Fed.Cas. p. 38, 40, No. 14,692e, where he said:

"The gentlemen of the bar will understand the rule laid down by the court to be this: It is the province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against the witness. If such answer may disclose a fact which forms a necessary and essential length in the chain of testimony, which would be sufficient to convict him of any crime, he is not bound to answer it so as to furnish matter for that conviction. In such a case the witness must himself judge what his answer will be; and, if he say on oath that he cannot answer without accusing himself he cannot be compelled to answer."

The court while approving the Marshall statement proceeds to restate the rule in light of later decisions, and offers a guide to a trial court who must determine whether a particular question may be incriminatory.

swer to a specific question put to persons called as witnesses before grand jury will in fact tend to incriminate that person rests primarily with the court, but at the same time it should be emphasized that where the witness on oath declares his belief that the answer to the question incriminates, or tends to incriminate him, the court cannot compel him to answer, unless it is perfectly clear, from a careful consideration of all the circumstances in the case that the witness is mistaken, and that the answer cannot possibly have such tendency. See Temple v. Commonwealth, 75 Va. 892, at pages 898–899; In re Stewart, 121 Wash. 429, 209 P. 849, 852.

Both the State and the petitioners for writ of prohibition, have urged the importance of a consideration by this Court of the questions propounded to petitioners by the foreman of the grand jury, paragraphs 'f' through 'i' of footnote 1, concerning the producing for inspection by the grand jury of the partnership records and cancelled checks of Layman & Sons, Contractors, for period of January 1, 1954 to January 1, 1959.[7]

The State urges as a general principle the asserted rule that:

"When a person or company is doing business with the State and is required by law to keep records and accounts, this person or company must present these records upon notice by a proper authorized person or legal body."

And cites as applicable to the petitioners 19 O.S.Supp. § 177.7 reading:

"To the extent available funds permit, but only after audit analysis of the books, accounts, and records kept by county officers, and in addition to the written exhibits and State Examiner and Inspector may now require of County officers, managers, and employees under Section or paragraph 215 of Title 74, Oklahoma Statutes 1951, the State Examiner and Inspector shall have the same authority and under the same penalty provisions to require of any purveyor of services, goods, wares, or merchandise to the county, whether for money, or property, a verification in writing under oath in full detail of dates, items, descriptions, unit rates, and amounts charged for and if paid, how and when paid. Purveyors of goods, wares, and merchandise of any sort for which public money or property is anticipated, demanded, or received, shall, at the time and for five (5) years thereafter keep careful and complete account thereof, which accounts shall be private and privileged to the public generally but open to inspection as public records at any time to the officer who required the same or to the Governing Board who allowed payment of the same, or to the County Attorney of such county, to the State Examiner and Inspector, to the Attorney General, or to a Grand Jury. Laws 1953, p. 284, § 7."

A careful study of the statute will disclose that it was enacted by the Legislature as a check on persons or firms dealing with the County Commissioners and covering purveyors of services, goods, wares or merchandise. This Court may not read into an Act provisions which are not clearly intended. That is to say, statutes cannot be enlarged by implication or extended by inference. Davison v. State, Okl.Cr., 281 P.2d 196.

We find no statute in Oklahoma requiring a person or corporation dealing with the State or a county, as part of its contract with the State or county in the construction of a building or a highway, to keep books for the inspection of anyone.[8]

---

7. For a note involving immunity from prosecution granted by statutory provisions by reason of answering incriminatory questions, see note in 38 A.L.R.2d at page 257, § 12.

8. Where statutes provide for the keeping of records for inspection, see: Narcotics Act, 63 O.S.1951 § 416; Sale of Barbiturates, 63 O.S.Supp.1959 §§ 465.15, 465.17; Sales of Poison, 59 O.S.1951 §

Therefore, for an answer to the problem we must determine whether in view of Sections 21 and 30, Art. II, Oklahoma Constitution, commonly known as the Bill of Rights, found as the 5th and 4th Amendments to the United States Constitution, a partner may be required to produce the partnership records for the inspection of a grand jury.

██ The general rule covering the production by an individual of personal books and accounts is succinctly stated in 58 Am. Jur. p. 62, § 69, and is supported by great weight of authority. It is said:

"The seizure or compulsory production of a man's private books or papers to be used in evidence against him is not substantially different from compelling him to be a witness against himself. Accordingly, the privilege of an accused not to be compelled to give evidence against himself in a criminal proceeding protects him from compulsory production of personal books or papers that contain evidence which would tend to incriminate him or expose him to a penalty or forfeiture. Such seizure or compulsory production is within the provisions providing that no person shall be compelled to testify against himself in a criminal cause."

In Rice v. State Board of Medical Examiners, 208 Okl. 440, 257 P.2d 292, the Supreme Court had for consideration an action to enjoin defendant from alleged illegal practice of medicine. The District Court of Marshall County entered an order directing defendant to produce records in response to subpoena duces tecum, and defendant appealed. The court held that enforcement of a subpoena duces tecum by requiring defendant to produce private records containing names of patients defendant had treated and treatment which had been administered would be violative of constitutional prohibition against self-incrimination.

Cited in support of the conclusion was Gillespie v. State, 1911, 5 Okl.Cr. 546, 115 P. 620, 35 L.R.A.,N.S., 1171, Ann.Cas. 1912D, 259 and Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, 752, with quotation from McKnight v. United States, 6 Cir., 115 F. 972, 981, taken from Boyd as follows:

"* * * A perusal of the decisions of the supreme court shows that no constitutional right has been subjected to more jealous care than that which protects one accused of crime from being compelled to give testimony against himself. The right to such protection existed at common law, and was carried into the constitution, that the citizen might be forever protected from inquisitorial proceedings compelling him to bear testimony against himself of acts which might subject him to punishment * * *

" 'It may be, it is the obnoxious thing in its least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be legally construed. A close and liberal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the court to be watchful of the constitutional right of the citizen, and against any stealthy encroachments thereon. Their motion should be, "Obsta principiis." ' * * * * "

See also United States v. Brasley, D.C., 268 F. 59, 64, 65.

██ It is the prevailing rule throughout the United States in both state and

---

345; Bank Records, 6 O.S.1951 § 127; Records and Reports of Dealers in Oil & Gas Equipment, 52 O.S.1951 § 375; Records of Motor Fuel Importers, 68 O.S.1951 § 740; Junk Dealers, 21 O.S. 1951 § 1041, and 19 O.S.Supp.1959 § 177.7 herein quoted.

federal courts that the privilege against self-incrimination extends to partnership records. Though it has been held that the rule does not extend to the records of a partnership which has a character so impersonal in scope of its membership and actualities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather embody their common or group interests. See 98 C.J.S. Witnesses § 448, p. 285; United States v. Onassis, D.C.S.C., 125 F.Supp. 190.

In In re Subpoena Duces Tecum, D.C. Cal., 81 F.Supp. 418, 419, it was held:

"Members of small family partnership were entitled to have subpoena duces tecum, returnable before grand jury, and directed to one of the members of the partnership, requiring him to bring certain records and communications, quashed under constitutional right of the people to be secure in their persons, houses, papers and effects. U.S.C.A.Const. Amend. 4." (The same constitutional provision is found in Oklahoma Constitution, Art. II, § 30).

In the within case the petitioners did not file a motion to quash, but were sworn as witnesses. But they have invoked their rights to rely upon Art. II, § 21, Oklahoma Constitution, the 5th Amendment, U.S. Constitution, and they may not be deprived of the right, where timely urged. It is not necessary under the situation here presented to discuss their rights under Art. II, § 30, Okl.Const. and the 4th Amendment, U.S.Const. But undoubtedly the rights under the section of the Constitution could be invoked where private papers would be forcibly taken from them and would be offered in evidence at a trial.

█ It is our conclusion that on further hearing before the grand jury the petitioners may not be forced to produce or be questioned about their private records, where the answer to the questions propounded might be incriminatory.

If the prosecuting authorities and the citizens of Tulsa County have reason to believe that their county has been defrauded by excessive charges for paving, they are to be commended in their efforts to determine the veracity of their suspicions. However, in the United States, we cannot by-pass Constitutional safe-guards and take short-cuts, in seeking out those whom it may be thought have violated the law. Ours is a government of laws and not of men. That is what every student of law in America is taught, though grave doubts arise when we see the State laws in a particular state exhausted and federal laws exhausted in a matter, then witness successful interference by politicians. Such is the beginning of the destruction of the theory. If inferior materials were provided, core tests should reveal that. If the contract has not been fulfilled, there are ways of getting at that. And where crimes may have been committed, there are many ways, within constitutional provisions and known to the prosecutors, even though more arduous than a short cut, whereby those who may have violated the law may be made to pay. At all events, Constitutional safeguards may not be by-passed.

BRETT and NIX, JJ., concur.